CHAMPION v NATION WIDE SECURITY, INC

Docket No. 100521. Argued November 8, 1995 (Calendar No. 6).
    Decided March 19, 1996. Rehearing denied 451 Mich 1240.

Cheryl Champion brought an action in the Wayne Circuit Court
against Nation Wide Security, Inc., and its agent, Eddie Lee
Fountain, alleging that Nation Wide, through Mr. Fountain,
had violated her civil rights by engaging in sexual harassment,
i.e., raping her, and that this discrimination led to her con-
structive discharge. The court, Richard P. Hathaway, J.,
granted Nation Wide's motion for summary disposition, reason-
ing that Mr. Fountain was not the plaintiff's supervisor, and
thus not an agent of his employer as required for recovery
under the Civil Rights Act. The Court of Appeals, WAHLS, P.J.,
and REILLY and R. M. DANIELS, JJ., affirmed, but found that a
question of fact existed regarding whether Fountain was given
the necessary authority to be Nation Wide's agent, thus sub-
jecting Nation Wide to liability under the theory of respondeat
superior. It upheld the lower court decision, however, conclud-
ing that the plaintiff had not shown that the defendants used
her response to Fountain's conduct as a factor in a decision
affecting her employment, and specifically rejected her claim
that her constructive discharge constituted a requisite employ-
ment decision (Docket No. 149365). The plaintiff appeals.

    In an opinion by Chief Justice BRICKLEY, joined by Justices
RILEY, MALLETT, and WEAVER, the Supreme Court held:

    An employer is strictly liable for quid pro quo sexual harass-
ment where its supervisor rapes a subordinate through the
exercise of managerial powers over the victim and causes the
subordinate to be constructively discharged.

    1. The Michigan Civil Rights Act outlaws quid pro quo sex-
ual harassment. Under MCL 37.2103(i)(ii); MSA 3.548(103)(i)(ii),
an employee must establish subjection to unwelcome sexual
conduct and that the employer or the employer's agent used
the employee's submission to or rejection of the proscribed
conduct as a factor in a decision affecting employment. In this
case, the supervisor's decision to rape the victim constituted the
requisite decision affecting employment and was taken in re-
sponse to the plaintiff's refusal to voluntarily submit to her

supervisor's sexual requests. The lack of consent is the gravamen of a sexual assault.

2. The law does not differentiate between active and constructive discharge. The decision to terminate in a constructive discharge case is imputed to the employer. Constructive discharge occurs only where an employer's or its agent's conduct is so severe that a reasonable person in the employee's place would feel compelled to resign. Rape is conduct severe enough to compel a resignation. In this case, the discharge did not occur following the rape, but contemporaneously with it. The decision to use force was the equivalent of a decision to discharge because Fountain should have expected that it would lead to the plaintiff's resignation. This decision affecting employment is actionable because the plaintiff's refusal to comply with Fountain's request for sexual favors led to his decision to use force.

3. When an employer gives its supervisors certain authority over other employees, it also must accept responsibility to remedy the harm caused by a supervisor's unlawful exercise of that authority. In this case, Fountain used his supervisory power to put the plaintiff in the vulnerable position that led to her rape, and he would have been unable to rape her but for his exercise of supervisory authority. Strict liability is imposed on employers for quid pro quo sexual harassment committed by supervisory personnel. Quid pro quo harassment occurs only where an individual is in a position to offer tangible job benefits in exchange for sexual favors, or alternatively, to threaten job injury for a failure to submit. That individual is most often a person with supervisory powers.

Justice BOYLE, joined by Justices LEVIN and CAVANAGH, concurring, stated that because facts that the Supreme Court could not anticipate may unfold upon further development of the lower court record or, unknown to the Supreme Court, already may have been developed, the trial court should not be directed to enter judgment in favor of the plaintiff. If the state of the record is such that judgment should be entered for the plaintiff, the directive to remand the case to the trial court for further proceedings consistent with the Supreme Court's opinion will authorize the trial court to enter judgment. The trial court is in the best position to make the determination.

Reversed.

205 Mich App 263; 517 NW2d 777 (1994) reversed.

*Chambers, Steiner* (by *Angela J. Nicita*,

*Louis G. Corey,* and *Michelle J. Harrison)* for the plaintiff.

*Plunkett & Cooney, P.C.* (by *Ernest R. Bazzana),* for defendant Nation Wide Security, Inc.

Amici Curiae:

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Robert L. Willis, Jr.,* Assistant Attorney General, for the Michigan Civil Rights Commission and the Michigan Department of Civil Rights.

*Stark & Gordon* (by *Sheldon J. Stark, Carol A. Laughbaum,* and *Martha I. Seijas)* for National Lawyers Guild, *Paul J. Denenfeld* for American Civil Liberties Union, *James Schuster* for Michigan Employment Lawyers Association, *Jeffrey Meyers* for Michigan Trial Lawyers Association, *Julie Field* for University of Michigan Women and the Law Clinic, and *Elizabeth K. Bransdorfer* for Women Lawyers Association of Michigan.

*Miller, Canfield, Paddock & Stone, P.L.C.* (by *Alison B. Marshall* and *Charles S. Mishkind),* for Michigan Manufacturers Association and Employers' Association.

BRICKLEY, C.J. In this case, we must decide whether an employer is liable for quid pro quo sexual harassment under MCL 37.2103(i); MSA 3.548(103)(i) where one of its employed supervisors rapes a subordinate and thereby causes her constructive discharge. We hold that an employer is liable for such rapes where they are accomplished through the use of the supervisor's managerial powers. We believe that this result best effectuates the remedial purpose of the Civil Rights Act, MCL

37.2101 *et seq.*; MSA 3.548(101) *et seq.* The opinion of the Court of Appeals is reversed insofar as it denies relief under the act. Furthermore, because defendant has made sufficient admissions to establish liability under the rule we announce today, pursuant to MCR 7.316(A)(7), we order the trial court to render judgment in favor of plaintiff under MCR 2.116(I)(2).

I

The incidents giving rise to plaintiff Cheryl Champion's claim began shortly after she returned from a maternity leave to resume her position as a security guard with defendant, Nation Wide Security Services, Inc. At that time, the company assigned Ms. Champion to a new supervisor, Eddie Lee Fountain.[1] There is no dispute that Mr. Fountain scheduled plaintiff's work, trained her, and oversaw and evaluated her performance. He also played a role in disciplining her.

During her first days back at work, Mr. Fountain made sexually suggestive remarks to Ms. Champion, including an admission that he was "flirtatious" and that he found her "attractive." Other remarks and sexually suggestive conduct followed.

One Saturday, less than a month after her return, Mr. Fountain unexpectedly contacted Ms. Champion, who was not previously scheduled to work until the following Monday. He asked her if she would be available to report for duty at Deaconess Hospital in Detroit. Ms. Champion agreed to the assignment and prepared to report for work. However, while getting ready, Ms. Champion accidentally burned her uniform trousers while pressing them. She called Fountain to in-

---

[1] Defendant Fountain is not a party to this appeal.

form him of the accident, and he gave her permission to use regular black or navy blue trousers. Minutes later, however, he called back with the unusual request that she wear a black or blue dress instead. When Ms. Champion informed Mr. Fountain that she did not have a dress and that she was running late, he allowed her to wear her regular trousers.

When Ms. Champion arrived at her post, she learned that Mr. Fountain had dismissed all other security personnel. Ms. Champion and Mr. Fountain were then the only two security guards at the hospital. After Ms. Champion reported to Mr. Fountain, he informed her that he had a state trooper check into her background to find out if she "had a clean medical background." He then remarked that he thought she was "ready" because she had just had a baby. He also stated that he wanted to go home with her to find out if she had a boyfriend. Finally, Mr. Fountain suggested that her future job security and success were tied to his approval or disapproval. Mr. Fountain asserted that if Ms. Champion went along with him, she would have nothing to worry about as long as she worked for him. He said he would "take care of" her and that she would never have to "worry" about her job. At this point, Ms. Champion flatly rejected Mr. Fountain's offer.

Later that same day, the hospital closed and Mr. Fountain and Ms. Champion were the only two people on the premises. At that time, Mr. Fountain told Ms. Champion to accompany him on security rounds. His stated purpose was to train her. However, after Mr. Fountain had ordered Ms. Champion into a remote part of the building, he locked a door to an examination room and trapped her. He then demanded that she have sex with him. When she refused, he raped her.

Ms. Champion immediately left work and returned home. She then reported the rape to police and was rushed by ambulance to the hospital. She never returned to Nation Wide after the attack.[2]

Ms. Champion filed the present action in the Wayne Circuit Court on February 14, 1991. Central to this appeal, she alleged that Nation Wide, through its agent, Mr. Fountain, had violated her civil rights by engaging in sexual harassment. She further alleged that this discrimination led to her constructive discharge. However, the trial court granted Nation Wide's motion for summary disposition of Ms. Champion's sexual harassment claim. The court reasoned that Mr. Fountain was not Ms. Champion's supervisor and, thus, not an "agent" of his employer as required by the Civil Rights Act for recovery.

While agreeing with the result, the Court of Appeals correctly reversed the trial court's finding that Mr. Fountain was not Ms. Champion's supervisor. Indeed, the Court of Appeals found that a "question of fact existed regarding whether Fountain was given the necessary authority to be Nation Wide's agent, thus subjecting Nation Wide to liability under the theory of respondeat superior." 205 Mich App 263, 267; 517 NW2d 777 (1994). However, the Court of Appeals upheld the lower court because it concluded that Ms. Champion had not shown that Nation Wide or Mr. Fountain used her response to Mr. Fountain's conduct as a factor in a decision affecting her employment. Specifically, it rejected the plaintiff's claim that her constructive discharge constituted the requisite employment decision. As this opinion makes clear, the Court's reasoning was in error.

---

[2] Similarly, as soon as Nation Wide found out about the attack, Mr. Fountain was suspended from employment. He, too, has never returned to work for Nation Wide.

II

Unlike its federal counterpart, the Michigan Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.,* contains a provision specifically designed to outlaw two forms of sexual harassment: hostile work environment sexual harassment and "quid pro quo sexual harassment." *Radtke v Everett,* 442 Mich 368; 501 NW2d 155 (1993); see also *Meritor Savings Bank, FSB v Vinson,* 477 US 57, 64-65; 106 S Ct 2399; 91 L Ed 2d 49 (1986). This case involves quid pro quo harassment.

The act clearly sets forth two separate theories under which a party may make out a claim for quid pro quo harassment:

> (i) Discrimination because of sex includes sexual harassment which means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature when:
> (i) Submission to such conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education, or housing;
> (ii) Submission to or rejection of such conduct or communication by an individual is used as a factor in decisions affecting such individual's employment, public accommodations or public services, education, or housing. [MCL 37.2103(i)(i), (ii); MSA 3.548(103)(i)(i), (ii).]

A party pursuing a claim under the second subsection must establish two things: (1) that she was subject to any of the types of unwelcome sexual conduct or communication described in the statute, and (2) that her employer or the employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision

affecting her employment. See also *Kauffman v Allied Signal, Inc,* 970 F2d 178 (CA 6, 1992).[3] It is this second requirement that forms the basis of dispute in the present case and we find that Ms. Champion has satisfied that requirement.[4]

It is this Court's opinion that Mr. Fountain's

---

[3] The first prong of this test was obviously met since Champion did not encourage nor desire the sexual overtures made by Fountain.

> *Q.* He did what now?
> *A.* He locked the door and he stated there is no use of you screaming, running or hollering because no one will hear you, there is no one in the building but me and you.
> *Q.* All right. What happened then?
> *A.* By this time I had really gotten nervous, I began to feel very uncomfortable and inside this room there were three rooms inside this one room and . . . .
> *Q.* What happened next.
>
> * * *
>
> *A.* Hm-hmm. As we started to go into the other room at this point this is where he approached me and he started kissing me.
> *Q.* And then what happened?
> *A.* At the same point in time he was. backing me into another room.
> *Q.* And then what happened?
> *A.* And I told him to stop and he persisted.
> *Q.* And what happened?
> *A.* Once into this room there was like an examining table, he backed me into that table.
> *Q.* And then what happened?
> *A.* I was pleading with him to stop.
> *Q.* You kept saying stop?
> *A.* Please stop. And trying to push him off of me. The more I tried to push him off and I was turning my head from side to side to try to keep him from kissing me, the more persistent he became.

[4] Because we conclude that the plaintiff has made out a case of quid pro quo harassment under the second subsection, we need not consider whether she has also made out such a claim under the first. *Lynch v Nat'l Acceptance Co of Chicago,* 329 Mich 615; 46 NW2d 403 (1951).

This Court generally does not make this sort of factual determination, such determinations being in the province of the factfinder. However, given defendant's admissions both in the courts below and in this Court, we find that no reasonable juror could disagree with our conclusion that plaintiff has satisfied the second requirement.

decision to rape Ms. Champion constituted the requisite "decision affecting . . . employment." In addition, this was a decision taken in response to Ms. Champion's refusal to voluntarily submit to Mr. Fountain's sexual requests. Indeed, lack of consent is the gravamen of a sexual assault.

In reaching our conclusion that plaintiff has satisfied all the requirements under MCL 37.2103(i)(ii); MSA 3.548(103)(i)(ii), we reject two theories that defendant claims absolves it of liability. First, defendant asserts that, because it did not actively terminate plaintiff, it made no employment decision in response to her rejection of Mr. Fountain's advances. Second, defendant claims that Mr. Fountain was not acting as its agent when he raped Ms. Champion because defendant did not authorize the rape. We deal with each of these arguments in turn.

We find that the Court of Appeals acceptance of defendant's first argument to be in error because it misinterprets the law of constructive discharge. It is well established that the law does not differentiate between employees who are actually discharged and those who are constructively discharged. In other words, once individuals establish their constructive discharge, they are treated as if their employer had actually fired them. *Lopez v S B Thomas, Inc,* 831 F2d 1184, 1188 (CA 2, 1987). The decision to terminate in a constructive discharge case, therefore, is imputed to the employer.

The Court of Appeals, however, somehow attributes responsibility for the discharge to Ms. Champion. This result unjustly blames the victim, especially because a constructive discharge occurs only where an employer or its agent's conduct is so severe that a reasonable person in the employee's place would feel compelled to resign. *Vagts v Perry Drug Stores, Inc,* 204 Mich App 481, 487-

488; 516 NW2d 102 (1994). *Young v Southwestern Savings & Loan Ass'n,* 509 F2d 140 (CA 5, 1975). Mr. Fountain's rape of Ms. Champion was certainly conduct severe enough to compel her to resign. Indeed, we would hesitate to expect any rape victim to return to the setting in which her sexual assault occurred.

However, the conclusion that Nation Wide's agent constructively discharged Ms. Champion does not, by itself, establish a violation of MCL 37.2103(i)(ii); MSA 3.548(103)(i)(ii). The Court of Appeals correctly ruled that liability under the provision occurs only where the constructive discharge is a result of the plaintiff's response to the sexual conduct.

However, in ruling that the constructive discharge in this case did not result from Ms. Champion's refusal to submit to Mr. Fountain's sexual conduct, the Court of Appeals misapprehends the point when the constructive discharge occurred. The discharge did not occur following the rape, but contemporaneously with it. The decision to use force, in other words, was the equivalent of a decision to discharge because Mr. Fountain should have expected that it would lead to Ms. Champion's resignation. This "decision affecting . . . employment" is actionable under MCL 37.2103(i)(ii); MSA 3.548(103)(i)(ii) because Ms. Champion's refusal to comply with Mr. Fountain's requests for sexual favors led to his decision to use force.[5] Therefore, we reject defendant's first argument against liability.

We also reject defendant's second argument.

---

[5] As previously noted, even without the discharge, the decision to rape was, in all respects, "a decision affecting [Ms. Champion's] employment" taken in response to her refusal to submit to Mr. Fountain's sexual requests. It can hardly be disputed that, even if Ms. Champion had returned to work, the rape would have "affected" her employment in some way.

Defendant has suggested that the Civil Rights Act will not impose liability on defendant because it never authorized Mr. Fountain to rape Ms. Champion. Thus, the defense has asserted, even if Mr. Fountain acted as Nation Wide's agent while performing his other supervisory duties, he did not act as its agent during the rape.

This construction of agency principles is far too narrow.[6] It fails to recognize that when an employer gives its supervisors certain authority over other employees, it must also accept responsibility to remedy the harm caused by the supervisors' unlawful exercise of that authority. *Henson v City of Dundee,* 682 F2d 897, 909 (CA 11, 1982).[7] From his scheduling decisions that allowed him to work alone with Ms. Champion to his ordering of her into a remote part of the building, Mr. Fountain used his supervisory power to put Ms. Champion in the vulnerable position that led to her rape. In fact, there is little doubt that Mr. Fountain would have been unable to rape Ms. Champion but for his exercise of supervisory authority.

Therefore, we adopt the nearly unanimous view that imposes strict liability on employers for quid pro quo sexual harassment committed by supervisory personnel.[8] The rationale supporting this rule

---

[6] See Restatement Agency, 2d, § 219(2)(d), p 481 (the master is liable for the tort of his servant if the servant "was aided in accomplishing the tort by the existence of the agency relation").

[7] In fact, an employer rarely authorizes an agent to break the law or otherwise behave improperly; yet, liability is frequently imputed to an employer for such conduct. For example, employers can be held liable for abusive work environment discrimination where agents have had a hand in creating or adding to the abuse, even if the employer expressly forbids the conduct. See, *Sumner v Goodyear Tire & Rubber Co,* 427 Mich 505, 542; 398 NW2d 368 (1986); *Langlois v McDonald's Restaurants of Michigan, Inc,* 149 Mich App 309; 385 NW2d 778 (1986).

[8] *Karibian v Columbia Univ,* 14 F3d 773 (CA 2, 1994); *Kauffman v Allied Signal, Inc, supra; Horn v Duke Homes,* 755 F2d 599 (CA 7, 1985); *Craig v Y & Y Snacks, Inc,* 721 F2d 77 (CA 3, 1983); *Katz v*

recognizes that most employers are corporate enti-
ties that cannot function without delegating super-
visory power. Allowing employers to hide behind a
veil of individual employee action will do little, if
anything, to eradicate discrimination in the work-
place. *Id.* at 909.

Indeed, immunizing an employer where it did
not authorize the offending conduct would create
an enormous loophole in the statute. Such a loop-
hole would defeat the remedial purpose underlying
this state's civil rights statute and would lead to a
construction that is inconsistent with the well-
established rule that remedial statutes are to be
liberally construed. *Eide v Kelsey-Hayes Co,* 431
Mich 26, 34; 427 NW2d 488 (1988); *Reed v Michi-
gan Metro Girl Scout Council,* 201 Mich App 10;
506 NW2d 231 (1993); 3 Singer, Sutherland Statu-
tory Construction (5th ed), § 60.01, pp 147-152.

In fact, under defendant's construction, an em-
ployer could avoid liability simply by showing that
it did not authorize the sexually offensive conduct.
Because employers rarely, if ever, authorize such
conduct, employees would no longer have a rem-
edy for quid pro quo sexual harassment. Further-
more, the party engaged in quid pro quo harass-
ment is almost always, by definition, a supervisor.
That is, quid pro quo harassment occurs only
where an individual is in a position to offer tangi-
ble job benefits in exchange for sexual favors or,
alternatively, threaten job injury for a failure to
submit. That individual is most often a person
with supervisory powers.

III

Our ruling today does not extend unlimited
liability to employers whose supervisors rape sub-
ordinates. However, we hold an employer strictly

*Dole,* 709 F2d 251 (CA 4, 1983); *Henson v City of Dundee, supra;
Miller v Bank of America,* 600 F2d 211 (CA 9, 1979).

liable where the supervisor accomplishes the rape through the exercise of his supervisory power over the victim. The rule we fashion is fully consistent with the results reached by other courts addressing this issue and with the legislative intent that employers, not the victims of sexual harassment, bear the costs of remedying and eradicating discrimination.

RILEY, MALLETT, and WEAVER, JJ., concurred with BRICKLEY, C.J.

BOYLE, J. I concur in the majority's analysis and with its reversal of the decision of the Court of Appeals. I write separately to indicate my dissatisfaction with the majority's directions to the lower court to enter judgment in favor of the plaintiff pursuant to MCR 2.116(I)(2). I recognize that the Court acts within its power in doing so. MCR 7.316(A)(7). However, facts that this Court could not anticipate may unfold upon further development of the lower court record or, unknown to this Court, may have already been developed. If the state of the record is such that judgment should be entered for the plaintiff, the directive to remand the case to the lower court for further proceedings consistent with this Court's opinion will authorize the trial court to enter judgment. Because the trial court is in the best position to make the determination, I would take that course.

LEVIN and CAVANAGH, JJ., concurred with BOYLE, J.