JACOBSON v PARDA FEDERAL CREDIT UNION

Docket No. 105050. Argued November 4, 1997 (Calendar No. 16). Decided
     May 19, 1998. Rehearing denied 458 Mich 1201.

    G. Marie Jacobson brought an action in the Oakland Circuit Court
     against Parda Federal Credit Union and some of its board members
     under the Whistleblowers' Protection Act, MCL 15.361 et seq.; MSA
     17.428(1) et seq., alleging that she had been constructively dis-
     charged from employment. Following a jury verdict for the plain-
     tiff, the court, Robert C. Anderson, J., directed a verdict for the
     defendants, finding that the claim was barred because it had not
     been filed within the requisite period of limitation. The Court of
     Appeals, MURPHY, P.J., and JANSEN and R. L. KACZMAREK, JJ., reversed
     in part in an unpublished opinion per curiam, finding that the
     defendant had engaged in a pattern of discriminatory conduct
     amounting to a continuing violation, and that the action was filed
     within the limitation period (Docket No. 162885). The defendant
     credit union appeals.

    In an opinion by Justice CAVANAGH, joined by Chief Justice
MALLETT, and Justices BOYLE and KELLY, the Supreme Court held:

    Because the plaintiff has alleged and proven an act by her
employer in violation of the Whistleblowers' Protection Act within
the limitation period, her action is not barred.

    1. While an employer's action may lead to a constructive dis-
charge, the discharge itself generally cannot become evident until
the employee, in fact, has left the employment. To say that a dis-
charge occurred whenever an employer's action that resulted in the
discharge occurred would be to set a date of occurrence in retro-
spect. Until the employee resigns, the employer's action has yet to
prove to be one of discharge. A discharge, be it constructive or oth-
erwise, must have in place all the events necessary to determine its
existence.

    2. A constructive discharge occurs only where an employer or
its agent's conduct is so severe that a reasonable person in the
employee's place would feel compelled to resign. The focus is on
the moment of resignation. In this case, the employee's resignation
occurred on October 21, 1989. A jury later agreed that it was rea-
sonable for her to resign at that time. Thus, she was constructively

discharged on October 21, 1989. The law does not differentiate between employees who were constructively discharged and those who were actually discharged. At the time plaintiff filed her claim, any act that occurred on October 21, 1989, could timely be addressed. The filing was timely on the basis of her constructive discharge.

Affirmed.

Justice TAYLOR, joined by Justices BRICKLEY and WEAVER, dissenting, stated that in the context of a constructive discharge claim, it is not an employee's tender of resignation that triggers the ninety-day limitation period under MCL 15.363(1); MSA 17.428(3)(1); rather, it is the employer's adverse action. Because the plaintiff alleges no adverse actions by the defendant that occurred within ninety days of the filing of her complaint, subsection 3(1) bars her claim.

Constructive discharge is not in itself a cause of action, but rather is a defense against an employer's argument that the employee is precluded from bringing suit because of voluntary termination of employment. An underlying cause of action is necessary to support maintenance of the employee's suit. It is the time of the employer's alleged discriminatory act giving rise to the underlying cause of action that signals the start of the statutory limitation period, not the date the employee eventually resigns. In this case, the relevant event for purposes of the limitation period was the defendant's alleged discriminatory action in August 1989, not the resignation itself. The majority's position places control over accrual of a cause of action in the hands of the employee. If the statute of limitations in constructive discharge cases is not triggered until an employee actually resigns, the employer reasonably cannot be viewed as having any control over when the action accrues and, accordingly, has no protection from stale claims.

*Morganroth & Morganroth* (by *Mayer Morganroth* and *Jeffrey B. Morganroth*) for the plaintiff.

*Bowen, Radabaugh, Milton & Brown, P.C.* (by *Thomas R. Bowen, Susan Leigh Brown,* and *Evelyn C. Tombers*), for the defendant.

Amicus Curiae:

*Plunkett & Cooney, P.C.* (by *Ernest R. Bazzana*), for Michigan Defense Trial Counsel, Inc.

CAVANAGH, J. The case calls on us to decide whether the plaintiff's action, which was successful on the merits before a jury, was barred by the statute of limitations prescribed by the Whistleblowers' Protection Act.[1] Because the plaintiff has alleged and proven an act by her employer in violation of the Whistleblowers' Protection Act within the limitation period, we find that her action is not barred.

The plaintiff filed her action on January 19, 1990, ninety days after writing and sending her letter of resignation to her employer. Her complaint alleged, inter alia, that she had been constructively discharged from her employment in violation of the act.[2] Following a jury verdict[3] for the plaintiff, the trial court granted defendant's motion for directed verdict,[4] agreeing with defendant's contention that the plaintiff's claim was barred because the plaintiff had not filed her claim within the ninety-day statutory period for claims under the act.[5]

The Court of Appeals reversed in part, finding a continuing pattern of discriminatory conduct, with most acts outside the statutory period, but at least

---

[1] MCL 15.361 *et seq.*; MSA 17.428(1) *et seq.*

[2] While plaintiff's suit initially named several individual members of her employer's board of directors as defendants, the trial court dismissed these claims pursuant to MCR 2.116(C)(8), finding the individual directors not to be employers within the meaning of the Whistleblowers' Protection Act. The Court of Appeals affirmed this dismissal, and the plaintiff has not filed a cross appeal on this issue.

[3] The jury awarded the plaintiff $277,000 in present economic damages and $128,000 in future economic damages. The jury also awarded $100,000 in noneconomic damages on the plaintiff's claim of intentional infliction of emotional distress. The trial court granted a directed verdict on this claim, and the Court of Appeals affirmed. Plaintiff has not filed a cross appeal on this issue.

[4] Now a judgment notwithstanding the verdict, MCR 2.610.

[5] MCL 15.363(1); MSA 17.428(3)(1).

one act within it.[6] The Court of Appeals concluded that this fit within an exception to the limitation period for continuing violations,[7] and that the plaintiff's complaint was therefore timely filed. We granted defendant's application for leave to appeal.[8]

We find that the plaintiff has shown that she was constructively discharged[9] on the date of resignation in retaliation for conduct protected by the act.[10] It is undisputed that when the plaintiff filed her action, the period of limitation covering any actions on the date of her resignation, October 21, 1989, had not expired. Accordingly, we affirm the result reached by the Court of Appeals, but on different grounds.[11]

I

Plaintiff G. Marie Jacobson worked for defendant Parda Federal Credit Union from 1972 until her resignation on October 21, 1989. Beginning as a temporary employee, she eventually rose to the position of executive vice president and chief operating officer. While

---

[6] Unpublished opinion per curiam, issued November 17, 1995 (Docket No. 162885).

[7] The Court of Appeals cited *Sumner v Goodyear Tire & Rubber Co*, 427 Mich 505, 528; 398 NW2d 368 (1986), for this proposition.

[8] 454 Mich 905 (1997).

[9] Constructive discharge is not, itself, a cause of action, but rather a defense to a claim of the voluntary leaving of the employee. See *Vagts v Perry Drug Stores, Inc*, 204 Mich App 481, 487; 516 NW2d 102 (1994). However, discharge is among the retaliatory actions prohibited by the act. Plaintiff alleged she was constructively discharged. The actual posturing of her claim, accordingly, is one of discharge in violation of the act.

[10] In reviewing a motion for judgment notwithstanding the verdict, we examine the testimony and all legitimate inferences that may be drawn in a light most favorable to the nonmoving party. If reasonable jurors could have reached different conclusions, the motion should have been denied. *Matras v Amoco Oil Co*, 424 Mich 675, 681-682; 385 NW2d 586 (1986).

[11] As will be seen, we find no need to reach the issue of a possible "continuing violation" encompassing acts beyond the limitation period.

serving in this position, plaintiff, after consulting with
her private attorney, contacted the Federal Bureau of
Investigation on February 28, 1989, to report her sus-
picions regarding a bond claim filed by the defendant
with its insurer. Plaintiff believed that this bond claim
was unsupported and, therefore, improper and per-
haps fraudulent.

That same day, the board of directors of the credit
union learned of plaintiff's action. Thereafter, plaintiff
noted a dramatic decline in her relationship with the
board. The plaintiff testified that the board was upset
and outraged that she had reported the credit union
to the FBI.[12]

Joseph Abate was president and CEO of the credit
union during this time, but had announced his retire-
ment effective April 1, 1989. Plaintiff believed herself
to be generally considered to be Abate's successor.
Shortly before Abate's retirement, she was assured by
members of the board that no search was being con-
ducted for a replacement for Abate, and that, even if
there was to be a search, she would have a "fair
chance" in any search to fill Abate's position. Follow-
ing Abate's retirement, however, the chairman of the
credit union's board, Herman Armstrong, was named
acting interim CEO.

From there, the plaintiff detailed at trial an exten-
sive collection of actions adverse to her taken by the
board, including the placing of a blind advertisement
for the CEO position, the offering of the position to
another candidate (who declined it), the failure of the
board to inform her of its eventual decision to

---

[12] It is apparent that, before the plaintiff contacted the FBI, she had
brought her concerns regarding the bond claim to the board of directors,
which nonetheless authorized the filing of the claim.

appoint her CEO, and the rescission of that decision before it in fact took effect.[13] It is undisputed that all these actions occurred well outside the statutory limitation period present when the plaintiff filed her action.

Eventually, on August 16, 1989, the credit union hired Katie Stone as interim president and CEO. Simultaneously, plaintiff's staff was assigned to report to Stone, and plaintiff was relieved of her previous job duties. Plaintiff testified that from this point forward she was ostracized and ignored by the board.

On October 21, 1989, plaintiff typed out a letter of resignation and mailed it to the board members, leaving an additional copy on Stone's desk. It is undisputed that plaintiff was alone at work that day, a Saturday. Plaintiff reported to work on the following Monday, October 23, 1989, and was instructed by Stone to clean out her desk and leave at once. Plaintiff complied with Stone's instructions.

On January 19, 1990, exactly ninety days after the day plaintiff wrote and mailed her letter of resignation, she filed this action. The defendant moved for a directed verdict at the close of plaintiff's proofs and again at the close of its proofs. The trial court took both motions under advisement. Following a jury verdict in favor of the plaintiff, the trial court granted a directed verdict (judgment notwithstanding the verdict) in favor of the defendant on all counts. The

---

[13] While it is apparent that the board decided to promote plaintiff to CEO after the other candidate refused the position, the plaintiff testified she was never informed of that decision and learned of it by way of a third-party's congratulatory letter a month later. When confronted by the plaintiff, the board informed her that it had already rescinded her promotion, and thereafter hired Katie Stone as interim CEO.

Court of Appeals reversed in part, with respect to the finding that plaintiff's whistleblowers' action was barred by the statute of limitations. It is from this portion of the Court of Appeals decision that the defendant appeals. We now affirm, for reasons other than those stated by the Court of Appeals.

II

The issue whether a claim is within the period of limitation is one of law, *Solowy v Oakwood Hosp Corp*, 454 Mich 214, 216; 561 NW2d 843 (1997), and hence reviewed de novo, *Cardinal Mooney High School v Michigan High School Athletic Ass'n*, 437 Mich 75, 80; 467 NW2d 21 (1991). Here, because a jury has found in favor of the plaintiff, and the trial court entered a directed verdict, plaintiff on appeal is entitled to all factual issues being viewed in the light most favorable to her, along with the drawing of reasonable favorable inferences from them. *Caldwell v Fox*, 394 Mich 401; 231 NW2d 46 (1975).

Plaintiff filed her action on January 19, 1990. Under the act, the period of limitation for an action alleging unlawful retaliatory conduct is ninety days. Therefore, the first step in any analysis of this claim is to determine whether the plaintiff has stated a claim regarding events *within* the limitation period.[14] Even if we were to agree with the analysis of the Court of Appeals of the events that were otherwise barred by the statute of limitations, the analysis must nevertheless begin at those times within the period of limita-

---

[14] A motion for judgment notwithstanding the verdict should be granted only if the evidence, viewed in a light most favorable to the nonmoving party, fails to establish a claim as a matter of law. *Orzel v Scott Drug Co*, 449 Mich 550, 557-558; 537 NW2d 208 (1995).

tion.[15] Simply stated, if the plaintiff has alleged an action within the period of limitation, and the trier of fact has found in favor of the plaintiff's claims, we need look no further.

Here the plaintiff resigned on October 21, 1989. She was admittedly alone at work on that day, a Saturday. Plaintiff testified that her working conditions had become intolerable, and offered considerable testimony in support of her claims that the conditions had steadily deteriorated in response to her reporting certain actions of the board of directors of her employer to the FBI.

The question when a constructive discharge occurs has been previously addressed by this Court only in the context of a Michigan Civil Rights Act[16] claim. *Champion v Nation Wide Security, Inc*, 450 Mich 702; 545 NW2d 596 (1996). Noting that "a constructive discharge occurs only where an employer or its

---

[15] Our decision rests on a claim of constructive discharge within the limitation period. Plaintiff also alleged numerous discriminatory acts by the defendant outside the limitation period. While those allegations do not, by themselves, form the basis we decide this matter on, they are nonetheless relevant to determining the reasonableness of the plaintiff's resignation, a determination required in addressing a claim of constructive discharge. See *Vagts*, n 9 *supra* at 487-488.

[16] MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*
Subsection 103 of the act provides:

(i) Discrimination because of sex includes sexual harassment which means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature when:

\*   \*   \*

(ii) Submission to or rejection of such conduct or communication by an individual is used as a factor in decisions affecting such individual's employment, public accommodations or public services, education, or housing.

agent's conduct is so severe that a reasonable person in the employee's place would feel compelled to resign,"[17] we found that the supervisor's conduct in *Champion* was severe enough to compel the plaintiff to resign.[18]

Defendant argues that *Champion* stands for the proposition that the act of an employer constitutes the action that results in the "discharge" in a constructive discharge situation, and that, therefore, the timing of the action of the employer controls. We disagree. The act of the employer and the constructive discharge were inseparable in *Champion*. Our analysis did not deviate from the standard expressed in *Vagts*, that is, would a reasonable person in plaintiff's position have felt compelled to resign as a result of the employer's sexual assault? Applying that same standard, the defendant's motion for judgment notwithstanding the verdict should not have been granted if, viewing the evidence in a light most favorable to the plaintiff, jurors could have reached different conclusions whether plaintiff's working conditions were so intolerable that a reasonable person in plaintiff's position would have felt compelled to resign. *Champion*, 450 Mich 710; *Vagts v Perry Drug*

---

[17] *Champion* at 710, citing *Vagts*, n 9 *supra* at 487-488, and *Young v Southwestern Savings & Loan Ass'n*, 509 F2d 140 (CA 5, 1975).

[18] In *Champion*, the plaintiff was forcibly raped by her supervisor while at work. The plaintiff, not surprisingly, never returned to work. She later filed an action against her employer under the Michigan Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*, alleging sexual harassment. We held "that an employer is liable for such rapes where they are accomplished through the use of the supervisor's managerial powers." *Champion*, 450 Mich 704. We also held that the rape was equivalent to a decision to discharge and that this " 'decision affecting . . . employment' is actionable under MCL 37.2103(i)(ii); MSA 3.548(103)(i)(ii) . . . ." *Id.* at 711.

*Stores, Inc,* 204 Mich App 481, 487; 516 NW2d 102
(1994).[19]

III

In this case, the plaintiff alleged that her work con-
ditions, as a result of retaliatory action prohibited by
the act, became intolerable as of October 21, 1989,
and she submitted her resignation on that day. The
trier of fact accepted this contention.

While an employer's action may lead to a construc-
tive discharge, such a discharge itself generally can-
not become evident until the employee has, in fact,
left the employment. It seems, therefore, that to say
that a discharge occurred whenever an employer's
action that resulted in the discharge occurred would
be to set a date of occurrence in retrospect. Until the
employee resigns, the employer's action has yet to
prove to be one of discharge. A discharge, be it con-
structive or otherwise, must have in place all the
events necessary to determine its existence.[20]

---

[19] We note that the rule of *Vagts* defining a constructive discharge was
not new to our jurisdiction. For at least fourteen years, Michigan appellate
cases have applied this standard in determining a constructive discharge.
See, e.g., *Mourad v Automobile Club Ins Ass'n,* 186 Mich App 715, 721;
465 NW2d 395 (1991); *Fischhaber v General Motors Corp,* 174 Mich App
450, 454-455; 436 NW2d 386 (1988); *LeGalley v Bronson Community
Schools,* 127 Mich App 482, 486-487; 339 NW2d 223 (1983).

[20] There may, of course, be instances where the events necessary to
determine a constructive discharge may be in place before the date of res-
ignation, such as when the employee has received definite notice of the
termination. Such circumstances might compel a finding of a constructive
discharge on a date before the date of resignation, although we do no
more than make this observation, because that is not the case before us.
Herein, while the plaintiff may have had indications that the upward
mobility of her career was in jeopardy, the record, when viewed, as
required, in a light most favorable to her, does not reveal that she had def-
inite notice of termination of her employment at some point before the
date of her resignation, and does indicate that, at that time, her resigna-
tion was reasonable under the circumstances.

On the day she resigned, plaintiff found her working conditions to finally be intolerable. As we have noted above, "a constructive discharge occurs only where an employer or its agent's conduct is so severe that a reasonable person in the employee's place would feel compelled to resign." *Champion* at 710-711, citing *Vagts* at 487-488, and *Young v Southwestern Savings & Loan Ass'n*, 509 F2d 140 (CA 5, 1975). Our approach historically has been to apply an objective standard of reasonableness to the action of the employee.

We decline the defendant's invitation to depart from our longstanding rule that a discharge occurs when a reasonable person in the employee's place would feel compelled to resign. In analyzing such circumstances, we cannot know what place the employee is in, and hence evaluate her conduct, until she actually resigns. It seems, therefore, that our focus in these far more common situations must be on the moment of resignation.[21] Here, the employee's resignation occurred on October 21, 1989. A jury later agreed that it was reasonable for her to resign at that time. She was constructively discharged on October 21, 1989.[22]

---

[21] We are not alone in relying on the date of resignation as the date on which a constructive discharge accrued. Several courts have determined, using a variety of rationales, that such a date provides the most clearly determinable indication of when a constructive discharge occurred. See, e.g., *Armington v School Dist of Philadelphia*, 767 F Supp 661, 666 (ED Penn, 1991), aff'd 941 F2d 1200 (CA 3, 1991), *Eure v United States Postal Service*, 711 F Supp 1365, 1372 (SD Miss, 1989), and *Stroud v VBFSB Holding Corp*, 917 SW2d 75, 81 (Tex App, 1996).

[22] The potential concern often argued against allowing an employee who controls the date at which she resigns to thereby "control" the accrual of her cause of action has been effectively dealt with by several courts. In particular, we note the Supreme Court of California's comprehensive statement in this regard:

"[O]nce individuals establish their constructive discharge, they are treated as if their employer has actually fired them." *Champion* at 710. The law does not differentiate between employees who were constructively discharged and those who were actually discharged. *Id.* At the time plaintiff filed her claim, any act that occurred on October 21, 1989, could timely be addressed. If the plaintiff had been fired by her employer on October 21, 1989, her claim would be timely. We, therefore, would find it timely on the basis of her constructive discharge.[23]

---

[The defendant's] concern to avoid vesting employees with sole control over the commencement of the statute of limitations period, which it asserts would leave employers unaware of the accrual of a cause of action until an employee resigns, is misplaced . . . . The essence of constructive discharge is that it is a termination of employment secured by the employer through indirect means. The employer remains in control in that he or she coerces the employee's resignation. Just as an employer who gives advance notice of impending termination of employment has knowledge sufficient to prepare for a possible lawsuit, an employer who creates or knows of intolerable conditions is in the same position to be prepared for a possible lawsuit when the coerced resignation finally occurs. In addition, the alleged intolerable condition—a circumstance in the control of the employer—normally continues up until the time of resignation, so that the litigation will not relate to some long-ago event, but to recent circumstances. Nor is it true that having the statute of limitations run from the date of termination leaves the employee able to delay the bringing of a lawsuit indefinitely. The longer the employee delays his or her resignation, the more difficult it may be to prove that the allegedly intolerable conditions of employment actually were intolerable on an objective basis . . . , or that it was these conditions that caused the employee's resignation. Further, the employer, who has created or permitted the persistence of known intolerable conditions, should not be able to complain of delay when the employee retains employment in the hope that conditions will improve or that informal conciliation may succeed. [*Mullins v Rockwell Int'l Corp*, 15 Cal 4th 731, 740; 63 Cal Rptr 2d 636; 936 P2d 1246 (1997) (citations omitted).]

[23] Hence we find no reason to address the other issues raised by the plaintiff, such as the continuing violation doctrine.

Because reasonable jurors could differ regarding whether plaintiff was constructively discharged in violation of the act at the time she resigned, we affirm the result of the Court of Appeals, which reversed the directed verdict, and reinstate the jury's award on the basis of the reasoning herein.[24]

Mallett, C.J., and Boyle and Kelly, JJ., concurred with Cavanagh, J.

Taylor, J. *(dissenting)*. This Whistleblowers' Protection Act case presents the issue what constitutes the "occurrence of the alleged violation of this act" that triggers the ninety-day period of limitation, MCL 15.363(1); MSA 17.428(3)(1), in the context of a constructive discharge claim. The majority concludes that it is the employee's tender of resignation that triggers the limitation period. I dissent because I believe that

---

[24] We pause to again address the dissent's claim that our action impairs the function of the statute of limitations in these cases. Despite the dissent's claims, our decision today entails a workable framework for the evaluation of statute of limitations issues in constructive discharge cases. Whether a resignation was reasonable at the time it was made controls the presence of a constructive discharge. Obviously a person claiming "intolerable" working conditions for some number of years will be hard pressed to convince a trier of fact, or even raise a question of fact, that such conditions were reasonably "intolerable." The hypothetical tardy plaintiff so feared by the dissent is more likely to harm, rather than help, her cause by delaying action.

We also note another likely consequence if the view of the dissent were to prevail. Faced with the likelihood that a court, in retrospect, would examine the factual record and fix the first serious negative action as the date of occurrence of the constructive discharge, the only logical advice a competent practitioner could offer a potential plaintiff would be to, at the first sign of serious trouble, resign, and file a claim of constructive discharge. To remain and attempt to resolve the problem would lead to the expiration of a claim, even if the work environment had become far worse since the time of the last *identifiable* management action that appears in the record. The natural resolution of most workplace difficulties, which thankfully do not reach the level of litigation, would likely be frustrated.

it is the employer's adverse action that triggers the limitation period. Because plaintiff alleges no adverse actions by defendant that occurred within ninety days of the filing of her complaint, subsection 3(1) bars plaintiff's claim.

Plaintiff began working for defendant in 1972. On February 28, 1989, after consulting with her attorney, plaintiff contacted the Federal Bureau of Investigation because she believed that defendant had filed an unsubstantiated and therefore improper bond claim with its insurer. Plaintiff claimed that the credit union board members' attitude toward her changed dramatically after they learned of this action.

At the time this took place, the president and CEO of defendant was retiring. Plaintiff thought she was generally perceived as his successor. However, an acting interim CEO was named. Plaintiff was among five candidates interviewed for the president and CEO position. After the position had been offered to and rejected by another candidate, the board voted on June 27, 1989, to appoint plaintiff to the position. Plaintiff testified that she did not learn of the appointment until July 25, 1989. On the following day, July 26, 1989, the board rescinded her promotion. Defendant's alleged basis for the rescission was that the National Credit Union Agency opposed plaintiff's appointment due to her lack of a background in finance and accounting. On July 27, 1989, plaintiff contacted her attorney for advice about what action to take with regard to the rescission of her promotion.

On August 16, 1989, plaintiff learned that another person, Katie Stone, had been appointed interim president and CEO. Simultaneous with Stone's appoint-

ment, plaintiff was relieved of her job duties, and her staff was instructed to report to Stone. She claimed that from that time on she was ignored and ostracized.

On Saturday, October 21, 1989, plaintiff typed out a letter of resignation, mailed it to the board members, and placed a copy on Stone's desk. Plaintiff acknowledged that her decision to resign was precipitated by defendant's conduct before the preparation of the letter and that she had had no contact with credit union management or board members on either October 21 or 22, 1989.

After receiving plaintiff's letter of resignation on October 23, 1989, Stone asked her to clean out her desk and leave immediately, which she did.

On January 19, 1990, plaintiff filed suit against defendant and some of its board members, alleging, inter alia, that she had been constructively discharged in violation of the Whistleblowers' Protection Act, MCL 15.361 *et seq.*; MSA 17.428(1) *et seq.* After the jury returned a verdict for plaintiff, the trial court granted defendant's motion for directed verdict on the ground that plaintiff's claim under the act was barred because she had not filed her claim within the statutory ninety-day period of limitation. However, the Court of Appeals reversed, finding that plaintiff was constructively discharged on October 23, 1989.

The majority affirms the result of the Court of Appeals, concluding that plaintiff's October 21, 1989, resignation triggered the ninety-day period of limitation and that her claim, accordingly, was timely. I disagree. I am convinced that the limitation period was triggered by defendant's alleged discriminatory actions, none of which occurred after August 1989.

Accordingly, I would reverse the Court of Appeals decision and reinstate the judgment of the trial court because plaintiff's claim was filed outside the limitation period.

The Whistleblowers' Protection Act's limitation provision, MCL 15.363(1); MSA 17.428(3)(1), states that a civil action must be brought "within 90 days after the occurrence of the alleged violation of this act." As is apparent from the quoted language, the Legislature has chosen the time of the alleged discriminatory act as the beginning of the limitation period. Because plaintiff filed suit on January 19, 1990, all incidents of alleged discriminatory retaliation that occurred before October 21, 1989, are barred.

Here, plaintiff alleges no incidents of discriminatory retaliation after August 1989, when Stone was named CEO and plaintiff was relieved of her duties. Therefore, in order to fit within the ninety-day limitation period, plaintiff was required to file a Whistleblowers' Protection Act claim by November 1989, at the latest. Because plaintiff failed to do so and did not file her claim until January 19, 1990, subsection 3(1) bars her claim.

Plaintiff attempts to avoid this result by contending that, in the context of a constructive discharge claim, the ninety-day limitation period is not triggered until the employee actually resigns. The majority adopts this position.

"[A] constructive discharge occurs only where an employer or its agent's conduct is so severe that a reasonable person in the employee's place would feel compelled to resign." *Champion v Nation Wide Security, Inc*, 450 Mich 702, 710; 545 NW2d 596 (1996). Where an employee establishes that he was

constructively discharged, he is treated the same as if the employer had actually discharged him. *Id.* However, this does not necessarily mean that the discharge imputed to the employer occurred on the date the employee resigned.

Constructive discharge is not in itself a cause of action, but rather is a defense against the employer's argument that the employee is precluded from bringing suit because he voluntarily terminated his employment.[1] Because constructive discharge is merely a defense to a claim of nonsuit, an underlying cause of action is necessary to support maintenance of the employee's suit. *Vagts v Perry Drug Stores, Inc,* 204 Mich App 481, 487; 516 NW2d 102 (1994). This Court has indicated that it is the time of the employer's alleged discriminatory act giving rise to the underlying cause of action that signals the start of the statutory limitation period, not the date the employee eventually resigns. *Champion, supra* at 711; *Sumner v Goodyear Tire & Rubber Co,* 427 Mich 505, 543-544; 398 NW2d 368 (1986). Further, the United States Supreme Court has consistently held that the relevant inquiry is " 'the time of the discriminatory acts,' rather than . . . 'the time at which the consequences of the acts became most painful.' " *Delaware State College v Ricks,* 449 US 250, 258; 101 S Ct 498; 66 L Ed 2d 431

---

[1] *Vagts v Perry Drug Stores, Inc,* 204 Mich App 481, 487; 516 NW2d 102 (1994); *Wolff v Automobile Club of Michigan,* 194 Mich App 6, 15; 486 NW2d 75 (1992); anno: *Circumstances which warrant finding of constructive discharge in cases under Age Discrimination in Employment Act (29 USC 621 et seq.),* 93 ALR Fed 10, 16; anno: *Circumstances in title VII employment discrimination cases (42 USC 2000e et seq.) which warrant finding of "constructive discharge" of discriminatee who resigns employment,* 55 ALR Fed 418, 420-421.

(1980); see also *Chardon v Fernandez*, 454 US 6, 8; 102 S Ct 28; 70 L Ed 2d 6 (1981).

In other words, it is the adverse employment action leading to the employee's decision to leave that constitutes the "discharge" giving rise to the cause of action. *Champion, supra* at 711. Thus, here, plaintiff's discharge occurred when Stone was named to the CEO position and plaintiff was relieved of all her duties in August 1989. Plaintiff's complaint alleged no further discriminatory acts after this point, even though her employment continued until her resignation two months later. "Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Ricks, supra* at 257; see also *Chardon, supra* at 8; *Sumner, supra* at 530. Plaintiff's decision to resign in October was simply the "delayed, but inevitable consequence" of the board's actions in July and August 1989. *Ricks, supra* at 257-258 (holding that the plaintiff's separation from his employment was not the event that triggered the running of the period of limitation because it was merely the delayed effect of his employer's decision to deny him tenure); see also *Chardon, supra*. Accordingly, Michigan and United States Supreme Court authority regarding constructive discharge, as well as the plain language of subsection 3(1), indicate that the relevant event for purposes of the limitation period was defendant's alleged discriminatory action in August 1989.

The majority nonetheless concludes that a constructive discharge generally occurs at the time of

resignation.[2] It cites *Champion, supra,* for the defini-
tion of constructive discharge, but does not follow
*Champion's* holding regarding when a constructive
discharge occurs. In *Champion,* a civil rights action
in which the plaintiff was raped by her supervisor,
this Court held that the constructive discharge
occurred at the time of the rape, not following the
rape. *Champion, supra* at 711. The majority appar-
ently views *Champion* as an exceptional case, as indi-
cated by its conclusion that the focus "in these far
more common situations must be on the moment of
resignation." *Ante* at 328. I agree that *Champion*
involved particularly egregious employer conduct.
However, by definition, a constructive discharge
involves employer conduct that is "so severe that a
reasonable person in the employee's place would feel
compelled to resign." *Id.* at 710. Employer conduct
that is sufficiently severe to cause a reasonable per-
son to feel compelled to resign, even if less extreme
than that involved in *Champion,* is the "occurrence of
the alleged violation" that triggers the statute of limi-
tations under subsection 3(1). I see no justification,
and the majority does not offer one, for creating a dif-
ferent rule for an instance of employer conduct that

---

[2] At n 20, the majority suggests that there may be instances where a
constructive discharge occurs before the date that the employee resigns
because the employee "has received definite notice of the termination."
However, it chooses not to discuss this possibility at length, summarily
concluding that plaintiff had no such definite notice here. I believe that
the actions plaintiff alleges in her complaint as constituting the construc-
tive discharge provided her with sufficiently "definite notice of the termi-
nation" when they occurred, i.e., in August 1989. Because plaintiff alleges
no conduct by defendant after August 1989, I do not understand how
plaintiff had more definite notice of her termination on October 21, 1989,
than she did in August 1989.

constitutes constructive discharge but is less egregious than the rape at issue in *Champion*.

The majority also indicates that there is something improper about focusing on the employer's action to determine the time of a constructive discharge because this results in setting a date of occurrence in retrospect. *Ante* at 327. However, subsection 3(1) compels this result by explicitly requiring that the period of limitation run from the "occurrence of the alleged violation." In the context of a constructive discharge, the "occurrence of the alleged violation" is clearly the employer's action that causes an employee to feel compelled to resign. The employee's decision to resign is a *response* to an alleged violation. The resignation itself cannot reasonably be considered the "occurrence of the alleged violation."[3] Thus, the majority's conclusion that plaintiff's resignation triggered the statute of limitations is inconsistent with the language of subsection 3(1), which places the focus on the time of the alleged discriminatory act.

In support of its conclusion that the date of a constructive discharge is the date a plaintiff resigns, the majority cites cases from other jurisdictions indicating that the resignation date "provides the most clearly determinable indication of when a constructive discharge occurred." *Id.* at 328, n 21. There may be cases in which it is difficult to pinpoint the spe-

---

[3] The majority asserts that defendant invites this Court "to depart from our longstanding rule that a discharge occurs when a reasonable person in the employee's place would feel compelled to resign." *Id.* at 328. However, there is no dispute with this definition of constructive discharge. The only dispute here is when the constructive discharge occurs: 1) when the employer's action occurs that causes the employee to reasonably feel compelled to resign or 2) when the employee actually resigns in response to such an action.

cific discriminatory act by the employer that caused the employee to reasonably feel compelled to resign. But the difficulty of such factual determinations in some cases is no excuse for departing from established law that focuses on the discriminatory act of the employer. Factfinders are frequently called upon to resolve factual disputes regarding when a party reasonably knew some matter. In any event, the present case raises no such factual disputes; plaintiff does not even allege any discriminatory conduct by defendant occurring after August 1989. Moreover, in the context of Whistleblowers' Protection Act cases, the Legislature has clearly stated that the ninety-day limitation period is triggered by the "occurrence of the alleged violation." Subsection 3(1). The majority fails to demonstrate how an employee's tender of resignation could be the "occurrence of the alleged violation."

Finally, the majority implicitly acknowledges that its rule places control over accrual of a cause of action in the hands of the employee. *Ante* at 328, n 22. It cites a case from another jurisdiction, *Mullins v Rockwell Int'l Corp*, 15 Cal 4th 731, 740; 63 Cal Rptr 2d 636; 936 P2d 1246 (1997), which rationalizes such a rule. *Mullins* basically concludes that, because constructive discharge cases by definition involve an employer who engages in conduct that causes the employee to resign, the employer remains in control. I agree that in a constructive discharge claim, the employer has a measure of control over the merits of the claim in the sense that it must have done something to cause the employee to feel compelled to resign. But if the statute of limitations in constructive discharge cases is not triggered until the employee

actually resigns, the employer cannot reasonably be viewed as having any control over when the action accrues and, accordingly, has no protection from stale claims. *Mullins* also contends that a delay by an employee in resigning will only make it more difficult for the employee to prove constructive discharge.[4] These assertions lose track of the primary purposes of statutes of limitations: "1) to encourage plaintiffs to pursue claims diligently, and 2) to protect defendants from having to defend against stale and fraudulent claims." *Lemmerman v Fealk*, 449 Mich 56, 65; 534 NW2d 695 (1995). A rule that allows plaintiffs to determine when a statute of limitations begins to run, e.g., by deciding when to resign, undermines these primary purposes of statutes of limitation. The rule adopted by the majority—that a constructive discharge does not occur until the employee actually resigns—neither encourages plaintiffs to promptly pursue their claims nor protects defendants from stale claims. Accordingly, the majority does not provide a satisfactory response to the criticism that it is improper for a statute of limitation to be triggered by an occurrence that is solely in the control of a plaintiff.

In conclusion, all the elements of plaintiff's claim under the Whistleblowers' Protection Act accrued before October 21, 1989. Plaintiff alleged no discriminatory act by defendant occurring after August 1989. Subsection 3(1) states that the "occurrence of the

---

[4] It is not necessarily true that delay will harm an employee's case in the context of an alleged constructive discharge. The additional information an employee may gain through continuing at a workplace after the employer's alleged discriminatory conduct may assist in proving the employee's claim.

alleged violation" triggers the limitation period. This Court's prior decisions mandate that the focus in constructive discharge cases be on the date of the discriminatory act, not on the date the plaintiff eventually resigns. Accordingly, subsection 3(1)'s ninety-day limitation period bars plaintiff's claim here. Therefore, I would reverse the Court of Appeals decision and reinstate the trial court's judgment for defendant.

BRICKLEY and WEAVER, JJ., concurred with TAYLOR, J.