UNITED RENTALS (NORTH AMERICA), INC., a Delaware corporation, Plaintiff,

v.

Jerry KEIZER, Grant Rent–All, Inc., a Michigan corporation, and, Mulder's Outdoor Power Equipment, Inc., d/b/a Mulder's Equipment & Rental, a Michigan corporation, Defendants.

Case No. 1:00CV831.

United States District Court,
W.D. Michigan.
Southern Division.

April 5, 2002.

Harold E. Elson, Borre, Peterson, Fowler & Reens, Pc, Grand Rapids, Mi, Robert Hill Smeltzer, Lowis & Gellen, Chicago, IL, for plaintiffs.

Steven C. Berry, Bigler, Berry, Johnston, Sztykiel, et al., Zeeland, MI, Robert Paul Cooper, Grand Rapids, MI, for defendants/Counter Claimants Jerry Keizer and Grant Rent-All, Inc.

Adam E. Parsons, Silverman, Smith & Bingel, PC, Kalamazoo, MI, for Defendant/Counter Defendant Mulder's Outdoor Power Equipment, Inc.

## OPINION RE CROSS MOTIONS FOR SUMMARY JUDGMENT

HILLMAN, Senior District Judge.

This is a diversity action alleging six counts: (1) breach of employment agreement; (2) violation of the Michigan Trade Secrets Act, MICH. COMP. LAWS § 445.1901 et seq.; (3) tortious interference with business relations; (4) tortious interference with contract; (5) civil conspiracy; and (6) breach of fiduciary duty of loyalty. The action also includes a counterclaim by defendant Jerry Keizer for breach of employment agreement. The matter presently is before the court on cross motions for summary judgment. Defendant/Counterplaintiff Jerry Keizer and defendant Grant Rent-All seek summary judgment on all claims against them (dkt # 66).[1] Plaintiff/counter-defendant United Rentals (North America), Inc., moves for summary judgment on Count I of its complaint and summary judgment on the counterclaim against it (dkt#71, 72). For the reasons that follow, defendants' motion for summary judgment is **GRANTED** and plaintiff's cross-motion for summary judgment on Count 1 is **DENIED**. Plaintiff's motion for summary judgment on the counterclaim is **GRANTED**.

## I.

Plaintiff United Rentals (North America), Inc., ("United") is in the business of selling and renting construction and industrial equipment. Defendant Jerry Keizer ("Keizer"), together with his wife, was a former one-third owner and General Sales Manager of Kubota of Grand Rapids, Inc. ("GR Kubota"). Grand Valley Investments, LLC ("GVI"), a limited liability company consisting of the five Grasman brothers (Larry, Jack, Terry, Russ and Rick) owned the other two-thirds of GR Kubota. GVI also fully owned and operated an equipment business in Hudsonville known as Grand Valley Equipment Company, Inc. ("GVEC").

Keizer also has been the owner and president of Grant Rent-All since its formation in December 1994. Grant Rent-All is in the business of selling construction and industrial equipment and is located within Newaygo County, Michigan. Although Keizer was president of Grant Rent-All since 1994, he never worked there until May 2000. Grant Rent-All is managed by Keizer's step-son and step-son-in-law.

Mulder's Outdoor Power Equipment is also in the business of renting and selling construction and industrial equipment and is located in Kent County, Michigan. Ron

---

**1.** Count 4 is alleged only against defendant Mulder's Outdoor Power Equipment, Inc.

Keizer, brother of defendant Keizer, is employed by Mulder's.

In April 1998, United offered to purchase all of the stock of GR Kubota and GVEC for $22.75 million. In its offer, United required a five-year non-compete agreement from the owners of the companies.

GVI determined that it would buy out Keizer's interest in GR Kubota prior to selling GR Kubota and GVEC to United. It therefore made an offer to Keizer to buy out his stock interest for a purchase price, in conjunction with a five-year employment agreement that included an agreement not to compete anywhere in Michigan west of I–75 and US–23. Keizer refused to sign such an unlimited non-competition agreement because of his then-current involvement with Grant Rent–All. GVI agreed to modify the non-competition agreement to exclude Newaygo County.

The evidence is undisputed that at the time of the agreements, the Grasman brothers were all aware of the existence of Grant Rent–All, that Keizer had an interest in Grant Rent All, and that his son and son-in-law operated the company. The attorney for GVI conveyed to United that Keizer and/or his affiliates (his sons) had such an interest. (Def. Ex. H at 178–81; Def. Ex. D; Def. Ex. Q at 17–20; Def. Ex. P at 17; Def. Ex. R at 26–28.) The evidence also is undisputed that between January 1995 and May 1998, approximately two-thirds of the customers of Grant Rent–All were located in Newaygo County. The remaining one-third were located outside of Newaygo County. (Def. Ex. A, ¶¶ 4–5; Def. Ex. R at 66, 68, 82.)

Keizer ultimately entered into a stock option agreement with GVI, in which he agreed to sell his shares of GR Kubota to GVI for $1,475,000.00. Under the Stock Option Agreement, Keizer agreed that if GVI exercised its option, Keizer would enter into a covenant "not to compete with GR Kubota and GVEC for five years (except in Newaygo County) and otherwise in form and substance agreeable to URI [United Rentals, Inc.]. . . ." The agreement also provided that if GVI exercised the option, GR Kubota would enter into a five-year employment agreement with Keizer at a salary of $75,000.00 per year, plus benefits. According to the option agreement, Keizer's employment agreement would be terminable only for just cause.

Subsequently, GVI exercised its stock option. On June 1, 1998, Keizer signed an employment agreement with GR Kubota. That agreement provided that:

This Agreement contains the entire agreement of the parties and supersedes all prior or contemporaneous negotiations, correspondence, understandings and agreements between the parties, regarding the subject matter of this Agreement. This agreement may not be amended or modified except in writing signed by both parties and supported by new consideration.

(Def.Ex.F, ¶ 12.)

The non-competition, non-solicitation portion of the employment agreement provides in relevant part:

For a period commencing on the Closing Date and terminating five (5) years thereafter (the "Restricted Period"), neither the Employee nor any of his Affiliates shall, anywhere in the Target Area, (as herein defined), directly or indirectly, acting individually or as the owner, shareholder, partner, or employee of any entity, (i) engage in the operation of any equipment sale, rental or leasing business; (ii) enter the employ of, or render any personal services to or for the benefit of, or assist in or facilitate the solicitation of any business engaged in such activities; or (iii) receive or purchase a financial interest in, make a loan to, or make a gift in support of, any such

business in any capacity, including, without limitation, as sole proprietor, partner, shareholder, officer, director, principal, agent, trustee or lender .... For purposes hereof, the term "Target Area" shall mean the area within the state of Michigan west of I–75 and U.S. Route 23, but shall exclude Newaygo County. (Def.Ex.F, ¶ 7.2.) The employment agreement also contained a confidentiality provision, which states:

> During the Restricted Period and thereafter, the Employee shall keep secret and retain in strictest confidence, and shall not use for the benefit of himself or others, all data and information relating to the Business ("Confidential Information"), including, without limitation, know-how, trade secrets, customer lists, supplier lists, details of contracts, pricing policies, operational methods, marketing plans or strategies, bidding information, practices, policies or procedures, product development techniques or plans, and technical processes; provided, however, that the term "Confidential Information" shall not include information that (i) is or becomes generally available to the public other than as a result of disclosure by the Employee, or (ii) is general knowledge in the equipment, rental, sales or leasing business and not specifically related to the Business.

(Def.Ex.F., ¶ 7.3.)

In addition, the employment agreement contains a series of provisions regarding termination. First, the agreement permits the employer to terminate Keizer for seven different types of cause. (Def.Ex.F, ¶ 6.1.) If terminated for cause, Keizer is not entitled to any further compensation or benefit. Second, the agreement permits the employer to terminate Keizer without cause, but requires the employer to pay Keizer his salary for the remainder of the term of the agreement. (Def.Ex.F,

¶ 6.2.) Third, Keizer is permitted to terminate the agreement upon fifteen days notice, but Keizer forfeits all further compensation under the agreement by such termination. (Def.Ex.F, ¶ 6.3.) Fourth, in the event of a disability of 60 consecutive days or 120 days in any 12–month period, either party may terminate the agreement with no further compensation. (Def.Ex.F, ¶ 6.4.) Similarly, in the event of death, no further compensation is owed. (Def.Ex.F, ¶ 6.5.) No dispute exists that Keizer was not terminated for cause or for disability or death.

Paragraph 6.6 of the employment agreement addresses the continuation of the employment agreement upon the merger or sale of assets of the company:

> This Agreement shall not be terminated by any voluntary or involuntary dissolution, reorganization, merger, consolidation or transfer of assets of the Company, or by any other act or event of or suffered by the Company, if a surviving or resulting corporation or other entity or person continues (or resumes after a period of not more than sixty days) the business of the Company. In any such event, if the business of the Company is so continued or so resumed, this Agreement shall be binding on and shall inure to the benefit of the corporation or other entity or person surviving or resulting or to which such assets shall have been transferred and the Employee shall be a General Sales Manager or other comparable official of that part or division of such corporation or other entity or person that shall have been the Company immediately prior to such transaction. If, in any such event, the business of the Company is not so continued or so resumed, such event shall be deemed to constitute termination without cause by the Company as provided in section 6.2.

(Def.Ex.F, ¶ 6.6.) Finally, the employment agreement expressly reserved the employer's right to terminate:

> Any other provision of section 3 or this Section 6 or otherwise in this Agreement to the contrary notwithstanding, the Company shall have the right, in its absolute discretion, to terminate this Agreement and the Employee's employment hereunder at any time in accordance with the foregoing provisions of this Section 6, it being the intent and purpose of the foregoing provisions of this Section 6 only to set forth the consequences of termination with respect to severance or other compensation payable to the Employee on termination in the circumstances indicated.

(Def.Ex.F, ¶ 6.7.)

Further, the employment agreement states that Keizer

> is hereby employed as General Sales Manger of the Company and shall devote his full attention, energies and abilities in that capacity of the proper management and conduct of the Company's business, to the exclusion of any other occupation. As General Sales Manager, Employee shall have such duties as are consistent with his duties prior to the date of the Agreement, unless changed by the Officers or Board of Directors in the future, provided, however, that Employee shall be employed at the Company's principal place of business in Kent County, Michigan.

(Def.Ex.F, ¶ 2.)

On June 9, 1998, United purchased from GVI all of the stock and assets of GR Kubota and GVEC for $22,750,000.00, pursuant to a stock purchase agreement. (Pl. Resp. to Def. Motion Ex. E.) Thereafter, GR Kubota and GVEC were merged into United.

United's principal negotiator, Kai Nyby, asserts that at the time of the negotiations between the Grasmans and United, Nyby was led by the Grasmans to believe that Keizer had no role at Grant Rent–All and that the company was not directly competitive in the type of business with GR Kubota. The evidence, however, is undisputed that Nyby never spoke with Keizer regarding his role or that Keizer in any way deceived United about his role prior to the sale of Keizer's stock to GVI and Keizer's signing of the employment agreement. (Def. Ex. T at 14, 62, 64–65, 68–73.)[2]

From June 1, 1998 to March 6, 2000, Keizer was employed by United as General Sales Manager. On March 6, 2000, United advised Keizer that he was being replaced as General Sales Manager by Jeff Grasman (the son of Terry Grasman), who would thereafter be General Sales Manager for both the Grand Rapids and Hudsonville stores. Two weeks later, Jeff Grasman resigned and United then named Jack Grasman as General Sales Manager. Keizer thereafter was listed on company phone lists as "salesman." While Keizer's salary and benefits remained the same, he testified that he was told that he no longer had authority to review and approve proposed equipment sales and trade-ins and that his authority and responsibility had been taken away. (Def. Ex. H at 148–52; Def. Ex. O at 67–68.)

---

**2.** A factual dispute does exist whether sometime between August 1998 and May 1999, Keizer misrepresented to United's district manager, J.R. Taalman (then general manager of the Grand Rapids and Hudsonville locations), that his son owned Grant Rent–All, that it was his son's business, and that Grant Rent–All did not come into United's market. (Def. Ex. U at 33.) Although Taalman at one point testified that Keizer represented that he had no interest in Grant Rent–All, he later stated that he could not remember the exact words Keizer used. (Def. Ex. U at 151.) Any such misrepresentation, however, is not relevant to any party's understanding of the employment agreement at the time it was signed.

On April 11, 2000, Keizer advised GR Kubota that he was leaving his employment, and provided 15 days notice. His letter to General Sales Manager Jack Grasman advised that Keizer considered his demotion from General Sales Manager to be a termination without cause under ¶ 6.6 of the agreement and Keizer therefore believed he was entitled under ¶ 6.2 of the employment agreement to his salary for the remaining term of the agreement. Both District Manager Taalman and Branch Manager Shawn Grasman tried to get Keizer to reconsider leaving the company, but neither was willing to reinstate him to General Sales Manager. (Def. Ex. H at 148–52.)

In its amended complaint, United alleges that since his resignation from United, Keizer, in conjunction with defendants Grant Rent–All and Mulder's Equipment, has surreptitiously competed against United within the target area identified in the non-competition, non-solicitation provisions of his contract and has used his confidential knowledge of plaintiff's business and customers to irreparably harm plaintiff, all in violation of the employment agreement. Specifically, plaintiff alleges that Keizer and Grant Rent–All surreptitiously have sold equipment to United customers in the target area both directly and by running sales through Mulders; that Keizer and Grant Rent–All have offered equipment for sale to the general public within the target area both directly and through Mulder's; and that Keizer and Grant Rent–All have advertised and solicited customers in the target area, supplying those customers with the name, address and telephone number of his competing business. Plaintiff further alleges that Keizer and Grant Rent–All's conduct, alone and in conspiracy with Mulder's, violated the Michigan Trade Secrets Act, tortiously interfered with United's business and breached Keizer's fiduciary duty of loyalty to United.

In his counterclaim, Keizer contends that GR Kubota constructively terminated his employment pursuant to a reorganization under ¶ 6.6 of the employment agreement by demoting him from General Sales Manager to a salesperson. As a consequence, he contends that he is entitled to receive his salary for the term of the agreement, as provided in ¶¶ 6.6 and 6.2.

## II.

Both Keizer and Grant Rent–All (hereafter, collectively, "Keizer") and United have filed motions for summary judgment pursuant to FED.R.CIV.P. 56.

### A. *Standard of Review*

On a motion for summary judgment, the court must consider all pleadings, depositions, affidavits and admissions and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party moving for summary judgment has the burden of pointing the court to the absence of evidence in support of some essential element of the opponent's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989). Once the moving party has made such a showing, the burden is on the nonmoving party to demonstrate the existence of a genuine issue for trial. *Id.*

In order to prove that a triable issue exists, the nonmoving party must do more than rely upon allegations, but must come forward with specific facts in support of his or her claim. *Id.* After reviewing the whole record, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Booker v. Brown & Williamson Tobacco Co., Inc.,* 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). " '[D]iscredited testimony is not [normally] considered a sufficient basis' " for defeating the motion. *Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505 (quoting *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)). In addition, where the factual context makes a party's claim implausible, that party must come forward with more persuasive evidence demonstrating a genuine issue for trial. *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548; *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348; *Street,* 886 F.2d at 1480.

### B. *Breach of Employment Agreement*

▉ Under Michigan law, the court's primary task in construing a contract is to give effect to the parties' intentions at the time that they entered into the contract. *See Sobczak v. Kotwicki,* 347 Mich. 242, 79 N.W.2d 471 (1956); *SSC Assoc. Ltd. Partnership v. General Retirement Sys.,* 210 Mich.App. 449, 534 N.W.2d 160 (1995); *Terry Barr Sales Agency, Inc. v. All–Lock Co.,* 96 F.3d 174 (6th Cir.1996). The best evidence of the parties intent is the contract itself. *See Smith v. Physicians Health Plan, Inc.,* 444 Mich. 743, 514 N.W.2d 150 (1994); *Various Mkts., Inc. v. Chase Manhattan Bank, N.A.,* 908 F.Supp. 459 (E.D.Mich.1995). As a result, when the contract terms are plain and unambiguous, a court should construe the contract as it is written and presume that the parties' intent is consistent with the ordinary meaning of the terms in the contract. *See Pierson Sand & Gravel, Inc. v. Pierson Twp.,* 851 F.Supp. 850 (W.D.Mich.1994), *aff'd,* 89 F.3d 835, 1996 WL 338624 (6th Cir.1996).

▉ In determining the plain and ordinary meaning of contract language, a court may look to recognized dictionary definitions and ordinary principles of grammatical construction. *See Allstate Ins. Co. v. Freeman,* 432 Mich. 656, 443 N.W.2d 734 (1989). The contract must be interpreted as a whole, so as to give each of its provisions the meaning intended by the parties. *Leon v. Detroit Harvester Co.,* 363 Mich. 366, 109 N.W.2d 804 (1961). Reading a contract as a whole is necessary in determining whether ambiguity reasonably exists. *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.,* 702 F.Supp. 1317 (E.D.Mich.1988). In construing a contract, the court will select the construction that gives meaning of each of the provisions of the contract, so that no part of the contract is rendered meaningless. *Associated Truck Lines, Inc. v. Baer,* 346 Mich. 106, 77 N.W.2d 384 (1956). In addition, in construing the contract, the court must adopt the construction that will result in a reasonable, fair, and just contract as opposed to one that is unusual or extraordinary or produces unfair or unreasonable results. *Port Huron Area Sch. Dist. v. Port Huron Educ. Ass'n,* 120 Mich.App. 112, 327 N.W.2d 413 (1982).

▉ A court will construe a contract to avoid an interpretation that would require the parties to perform in an unlawful manner or that would lead to a result in contravention of public policy. *Stillman v. Goldfarb,* 172 Mich.App. 231, 431 N.W.2d 247 (1988). Further, ambiguities in the terms of a contract are construed against the maker or drafter. *See De Bruyn Produce Co. v. Romero,* 202 Mich.App. 92, 508 N.W.2d 150 (1993).

No genuine dispute exists that the employment agreement between Keizer and GR Kubota was based on a standard employment agreement provided to GVI (the Grasmans) by United. The attorney for

GVI, Stephen Kretschman, made some modifications to the standard agreement, most particularly to except Newaygo County from the non-compete clause. While Keizer sought such an exclusion, the language actually was drafted by Kretschman, modifying United's standard form. As a result, any ambiguity in the agreement must be construed against GR Kubota and its successor, United. *See De Bruyn Produce,* 202 Mich.App. 92, 508 N.W.2d 150.

### 1. Covenant not to compete, ¶ 7.2

 As previously recited, the non-compete clause of the contract was somewhat lengthy:

> For a period commencing on the Closing Date and terminating five (5) years thereafter (the "Restricted Period"), neither the Employee nor any of his Affiliates shall, anywhere in the Target Area, (as herein defined), directly or indirectly, acting individually or as the owner, shareholder, partner, or employee of any entity, (i) engage in the operation of any equipment sale, rental or leasing business; (ii) enter the employ of, or render any personal services to or for the benefit of, or assist in or facilitate the solicitation of any business engaged in such activities; or (iii) receive or purchase a financial interest in, make a loan to, or make a gift in support of, any such business in any capacity, including, without limitation, as sole proprietor, partner, shareholder, officer, director, principal, agent, trustee or lender .... For purposes hereof, the term "Target Area" shall mean the area within the state of Michigan west of I–75 and U.S. Route 23, but shall exclude Newaygo County.

(Def.Ex.F, ¶ 7.2.) United contends that the language of the agreement is not ambiguous and that, under the plain meaning of the terms, the agreement bars any competitive conduct outside Newaygo County. United asserts that the provision is labeled "Competition and Solicitation" and subsequently calls itself a "covenant not to compete." United argues that the provision, therefore, unequivocally intended to protect the goodwill of GR Kubota by preventing Keizer and his affiliates from engaging in any competitive activities outside of Newaygo County.

In support of its argument, United emphasizes the following specific words in the provision:

> neither [Keizer] nor any of his Affiliates, shall, anywhere in the Target Area (as hereinafter defined), directly or *indirectly,* ... (i) *engage in the operation of* any equipment sale, rental or leasing business; or (ii) enter the employ of ... any business *engaged in such activities* ....

United asserts that the language squarely intends to prohibit certain kinds of activities, not the physical location of any business, and that the word "indirectly" specifically was intended to prevent participation in any activities rather than physical location.

The structure of the provision, however, does not support United's "plain language" claim. The first clause squarely prohibits Keizer from operating an equipment business anywhere in the Target Area. The word "indirectly" strongly suggests participation in the operation of such business by indirect means, such as assisting another person to operate a business in the target area. It does not, however, suggest that the term was meant to bar the operation of a business outside the Target Area that might include rental or sale to someone inside the Target Area. When ordinary speakers refer to where a *business* is *operated,* they refer to the location of the business. A business ordinarily is not said to operate in an area solely because it rents or sells to someone who happens to live inside that area. For example, a retail store in Grand Rapids would not be said to

operate in Newaygo County simply because a customer drives from Newaygo to purchase an item at the Grand Rapids store, even if the store actively advertised in Newaygo.

United argues, however, that by using the words "engaging in the operation" the parties clearly intended to prohibit action or conduct, not business addresses. I would agree that the words bar a type of action, but the type of action barred is the operation of a business. United seeks to stretch the words "engaging in the operation" to mean "engaging in business" or "engaging in business activities." *See Dixon v. Royal Cup, Inc.*, 386 So.2d 481 (Ala.Civ.App.1980) (addressing a covenant containing the words "engag[ing] in the business of selling any items of a nature similar to those [sold by the employer]"); *Sobers v. Shannon Optical Co., Inc.*, 326 Pa.Super. 170, 473 A.2d 1035 (1984) (addressing non-compete clause prohibiting business seller from "engag[ing] in a business which is in any nature similar to the said business being purchased by the buyer ...."). The language of the instant non-compete agreement does not preclude Keizer from "engaging in business" or "business activities." Nothing in the language of the first clause suggests that the contracting parties agreed to bar all sales, rentals, advertising, or any other business activities inside the Target Area. Instead, it means what it says-that Keizer and his affiliates are barred from engaging in the operation of an equipment rental business inside the Target Area.

United argues that the second clause clearly bars the conduct of all business activities within the Target Area because the language itself includes the words "engaged in such activities." The quoted language, however, modifies and defines the type of business in clause two, which prohibits Keizer from "enter[ing] the employ of ... any business engaged in such activities." The phrase references the preceding clause, which defines the type of business. The words "engaged in such activities" refer back to the defining words of the preceding clause "equipment sale, rental or leasing" describing the type of business by whom Keizer could be employed or for whom he could perform services, not the kinds of activities he was proscribed from conducting in the Target Area. Keizer entered the employ of a defined business, but not one located in the Target Area.

The court finds, therefore, that the plain meaning does not support United's expansive reading of the contract language. Instead, the court finds the plain meaning of the language limits by location and type the businesses Keizer may own, operate or be employed by.

Even were the court to find ambiguity in the agreement, however, the court would find that no evidence supports United's interpretation of the parties' intent. In the first place, when a contract is ambiguous, contract provisions must be construed against the drafter. *See De Bruyn Produce*, 202 Mich.App. 92, 508 N.W.2d at 156 n. 4. *Higgins v. Lawrence*, 107 Mich.App. 178, 309 N.W.2d 194 (1981). No dispute exists that the employment agreement originally was drafted by United and subsequently modified by the attorney for the Grasmans and GR Kubota, subject to United's approval. Although the provision was inserted to make an exclusion demanded by Keizer, he did not draft the language. Regardless of whether GR Kubota and not United drafted the Newaygo County exclusion, United stands in the shoes of the drafter. When United purchased GR Kubota, it succeeded to the rights and obligations of GR Kubota under the contract. (Def.Ex.F, ¶ 6.6.) As a result, applying the ordinary rule of con-

struction against the drafter cuts against United's construction of the agreement.

In addition, under Michigan law, if a contract term is ambiguous, parol evidence is admissible to resolve the ambiguity and determine the intention of the parties. *See Goodwin, Inc. v. Coe*, 392 Mich. 195, 212, 220 N.W.2d 664 (1974). United strenuously argues that the circumstances of the transaction clearly demonstrate an intent to bar any competitive activity by Keizer in the target area. Specifically, United asserts that no reasonable person could have intended that Keizer be paid $1.4 million for his business if he could simply begin to compete with United in an alternate setting. United, however, misrepresents the transaction. United did not directly contract with Keizer. It did not pay him $1.4 million for his agreement not to compete. Instead, on the face of the stock option agreement, GR Kubota paid Keizer for all of his ownership interest in the business, its equipment, facilities, and goodwill. GR Kubota also agreed to pay $25,000 for Keizer's agreement not to engage in certain defined activity in order to facilitate the overall agreement between GVI and United for the sale of GR Kubota and GVEC. United, while providing a standard employment agreement, did not directly negotiate the agreement with Keizer and did not directly pay Keizer anything.

In addition, interpretation of the agreement to bar where Keizer may operate a competing business does not render meaningless his promise not to compete. Under the agreement, Keizer does not have an unrestricted right to compete on an equal footing with GR Kubota. Instead, substantial geographic limitations apply to the location of any competing business. The restriction on the location of Keizer's business provides competitive protection to GR Kubota, as Terry Grasman testified:

> Well, he's up in Grant. If somebody—if I lose a deal because you went to Jerry's Grant place, probably the customer wouldn't have got it from me anyway. Cause he's spending $200 in additional freight to go up to Grant or paying it for them to deliver down here.

(Def. Ex. R at 66.)

United argues, however, that the stock option agreement between Keizer and GVI provides substantial parol evidence to demonstrate that the parties intended to exclude all competitive activity in Western Michigan outside of Newaygo County. The stock option agreement states in relevant part:

> If GVI exercises the Option, Keizer agrees that he will enter into an agreement not to compete with [GR Kubota] or GVEC for five years (other than in Newaygo County) and otherwise in form and substance acceptable to [United], for which [GR Kubota] shall pay Keizer the sum of Twenty Five Thousand Dollars ($25,000) in cash at the time of the exercise of the Option.

(Def.Ex. C, ¶ 2.) United contends that this language, which is more general than that contained in the subsequent employment agreement, provides parol evidence to support its interpretation of the contract. The language, however, does not state that the parties intended that Keizer would conduct no competitive activity outside Newaygo County. While United is correct that the stock option language could be interpreted to have that meaning, the language does not mandate such a reading. As a result, in the absence of other evidence that the parties intended such a meaning, the stock option agreement does little to support United's position.

In addition, other provisions in the stock option agreement were not carried forward into the employment agreement in identical form. In particular, the stock option agreement stated that Keizer's employment agreement would be terminable

only for cause. The employment agreement, however, permitted United to terminate Keizer for any reason, providing only that certain forms of termination would entitle Keizer to continue to receive his compensation for the remaining term of the agreement.

Moreover, no other parol evidence supports United's contention. The Grasman's attorney testified without contradiction that the employment agreement was drafted to exclude Newaygo County precisely because Grant Rent–All was located in Grant, in Newaygo County. (Def. Ex. N at 56.) No genuine dispute exists that all the Grasman brothers were fully aware that Keizer was at least a partial owner of Grant Rent–All and that his sons or sons-in-law operated the business and that United was informed of Keizer's involvement with Grant Rent–All.

United now argues that it was told that Grant Rent–All was a small general rental company in Newaygo County and that only Keizer's son had an interest. United's attorney, however, expressly advised that the non-compete would need to exclude Newaygo County, where Keizer's "son operates a competing business." Thus, United was informed that Grant Rent–All was a competing business. In addition, whether United was aware that Keizer owned part of Grant Rent–All is of no consequence, since the agreement defines Keizer's son as an "affiliate" of Keizer, who would be equally barred by the agreement's terms.

Moreover, prior to completing its transaction with GVI and upon hearing that Keizer's son had an interest in Grant Rent–All, United advised that it would need to further investigate the type of business Grant Rent–All conducted. However, United's negotiator admits that he never asked Keizer to clarify his interest in Grant Rent–All or describe the type of business conducted by Grant Rent–All.

Keizer made no misrepresentations to United. Regardless of what United was told by GR Kubota, GVI and the Grasmans, those parties were well aware that Keizer had an interest in Grant Rent–All and that the exclusion of Newaygo County was intended to protect Keizer's interest in Grant Rent–All. United's contrary understanding is clearly not relevant to the intent behind the employment agreement signed by GR Kubota and Keizer.

Moreover, the undisputed facts show that both before and after the sale of Keizer's interest in GR Kubota, about one-third of Grant Rent–All's customers were located outside Newaygo County and Grant Rent–All advertised outside Newaygo County. In the absence of clear language demonstrating that the parties intended to shrink the operation of Grant Rent–All as it existed at the time of the agreement, no reasonable factfinder could conclude that the parties intended to do so in light of the parties' undisputed intention to exclude the operation of Grant Rent–All from the non-compete agreement.

■■■ Further, Michigan law does not favor noncompetition agreements. Until the mid 1980s, Michigan's antitrust statutes barred most noncompetition agreements as violative of Michigan public policy, providing only limited exceptions in the sale of certain businesses and certain route-sales employment contracts. In 1985, Michigan passed the Michigan Antitrust Reform Act, MICH. COMP. LAWS § 445.771 *et seq.*, which itself was amended in 1987 to permit reasonable employment noncompetition agreements:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agree-

ment or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

MICH. COMP. LAWS § 445.774a. The language of the provision requires this court to examine the reasonableness of the agreement in light of the surrounding circumstances in which it was made. Here, the undisputed evidence demonstrates that the Newaygo County exclusion in the employment agreement was intended to permit Keizer's relationship with Grant Rent–All and that no party contemplated restricting the then-current operations of Grant Rent–All. In light of the surrounding circumstances, United's proposed broad reading of the noncompetition clause is unreasonable under MICH. COMP. LAWS § 445.774a. *See Kelsey–Hayes Co. v. Maleki,* 765 F.Supp. 402, 406 *vacated pursuant to settlement,* 889 F.Supp. 1583 (E.D.Mich.1991) (agreement not reasonable where given a strained and broadened interpretation). In addition, in interpreting Michigan's statute, courts have held that the employer's business interest justifying such a restrictive covenant must be greater than mere competition, since the prohibition on all competition is in restraint of trade. *See id.* In order to be reasonable, a restrictive covenant must protect against the employee's gaining some unfair advantage in competition with his employer, but not prohibit the employ-

ee's future use of general knowledge or skill. *Id.*

In sum, no genuine issue of fact exists that the noncompetition clause of the employment agreement only bars Keizer from owning, operating or working for an equipment rental business located in the target area. While United may have intended that the noncompetition clause would bar Keizer from conducting any business activities outside Newaygo County, that intent was not set forth in the language of the agreement and was not shared by the parties to the agreement. Defendants Keizer and Grant Rent–All are entitled to summary judgment on the noncompetition clause.[3]

### 2. Confidentiality Clause, ¶ 7.3

 The confidentiality provision of the employment agreement is set forth in paragraph 7.3:

During the Restricted Period and thereafter, the Employee shall keep secret and retain in strictest confidence, and shall not use for the benefit of himself or others, all data and information relating to the Business ("Confidential Information"), including, without limitation, know-how, trade secrets, customer lists, supplier lists, details of contracts, pricing policies, operational methods, marketing plans or strategies, bidding information, practices, policies or procedures, product development techniques or plans, and technical processes; provided, however, that the term "Confidential Information" shall not include information that (i) is or becomes generally available to the public other than as a

---

**3.** The court does not reach the question of the reasonableness of either the duration or the geographic restriction contained in the noncompetition agreement. The court notes, however, that both are expansive and arguably unreasonable. Under the circumstances, United had the benefit of two years of non-

competition prior to Keizer's leaving the company. In light of the nature of the business and the limited amount of confidential information in issue, it is highly doubtful that this court could in good faith enforce more than two years of any noncompetition clause of such breadth.

result of disclosure by the Employee, or (ii) is general knowledge in the equipment, rental, sales or leasing business and not specifically related to the Business.

(Def.Ex.F., ¶ 7.3.) United asserts that Keizer has breached the provision and/or that Keizer will breach the provision in the absence of an injunction.

In support of his motion for summary judgment on Count 2, Keizer cites the testimony of Kai Nyby, United's Vice-President for Acquisitions, J.R. Taalman, United's Regional Manager, and Charles Pearce, the Grand Rapids Branch Manager for United. A review of the deposition excerpts provides no information that Keizer has taken or used any confidential information as defined in paragraph 7.3. Indeed, Taalman suggests only that Keizer took confidential information by making use of United's methods of making personal sales calls, contacting customers by telephone, sending out direct mailings, putting the company logo on a truck, and attending trade shows.

 It is black letter law that confidential information does not include "general knowledge, skill, or facility acquired through training or experience while working for an employer ...." *Follmer, Rudzewicz & Co., P.C. v. Kosco,* 420 Mich. 394, 362 N.W.2d 676, 680 (1984). The Michigan Supreme Court has declined to enforce a confidentiality agreement that attempts to protect such general knowledge. *Id.* Here, the use of telephone calls and sales visits, trade show attendance and company logos is basic marketing information not proprietary to United. United is unable to identify any confidential information appropriated or used by Keizer.

Keizer and Grant Rent–All, therefore, are entitled to summary judgment on the breach of contract claim.

## C. *Michigan Trade Secrets Act*

 The Michigan Trade Secrets Act ("MTSA") was enacted to prohibit disclosure of certain trade secrets.

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:

(i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use;

(ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

MICH. COMP. LAWS § 445.1902(d). United admits that "there has been no evidence adduced which suggests that Keizer physically took or used United's trade secrets." (Def. Resp. at 15.) However, United contends that no dispute exists that United has trade secrets. (Citing Def. Ex. O: Shawn Grasman Aff.; Def. Ex. P: Taalman Aff.) It contends, therefore, that Keizer inevitably will disclose United's trade secrets and that it is entitled to injunctive relief to prevent the disclosure.

In enacting the MTSA, the Michigan legislature adopted the Uniform Trade Secrets Act ("UTSA"), which also has been adopted by other jurisdictions. In reviewing Illinois' version of the UTSA, the Seventh Circuit held that where an employer proved that its former employee would inevitably use or disclose trade secrets if he went to work for a soft drink competitor, injunctive relief was proper. *See PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1270–71 (7th Cir.1995). United asserts that here, as in *PepsiCo,* Keizer will inevitably disclose trade secrets or make use of them in his competitive activities.

Accepting that Michigan would adopt the inevitable disclosure doctrine, *see Ford Motor Co. v. Lane*, 67 F.Supp.2d 745 (E.D.Mich.1999), the doctrine is unavailable to United on the facts of this case. United has asserted two broad types of trade secrets. First, Shawn Grasman avers that Keizer has intimate knowledge of United's customer requirements and habits. Such information, however, is not a trade secret. Keizer has worked in the rental industry for years, both before and after GR Kubota was owned by United, during which he became acquainted with rental customers in the area. Grasman's general affidavit regarding such knowledge does not meet the definition of a trade secret under the MTSA.

Second, with respect to the specific and detailed computerized financial records Taalman and Grasman identify as trade secret information, a question of fact exists whether such information amounts to a trade secret. United, however, has failed to introduce a shred of evidence that disclosure of such financial records by Keizer is inevitable. Indeed, in the two years between April 2000 and the present, United has discovered no evidence that Keizer either has in his possession or has disclosed such confidential information. In the face of these intervening two years, no evidence exists that Keizer either took such records or that, if he did, he has any intention of disclosing them. *See Ford Motor*, 67 F.Supp.2d 745 (holding that injunction may issue against person when that person plans to reveal a trade secret). In addition, even if Keizer originally possessed such information, in the absence of evidence that two-year-old financial records have continuing relevance, no factfinder could reasonably conclude that trade secrets exist that Keizer could reveal.

Defendants are entitled to summary judgment on the trade secrets claim.

### D. *Tortious Interference with Business Relations*

■ Defendants Keizer and Grant Rent-All next move for summary judgment on United's claim for tortious interference with business relations.

Michigan courts have described the elements of a claim of tortious interference with business relations as follows: (1) the existence of a valid business relationship or expectancy; (2) the interferer's knowledge of the relationship or expectancy; (3) an intentional interference that breaches or terminates the relationship or expectancy; and (4) resultant damage to the party whose relationship has been disrupted. *See, e.g. BPS Clinical Labs. v. Blue Cross & Blue Shield*, 217 Mich.App. 687, 552 N.W.2d 919, 925 (1996); *Lakeshore Community Hosp., Inc. v. Perry*, 212 Mich. App. 396, 401, 538 N.W.2d 24 (1995); *Trepel v. Pontiac Osteopathic Hosp.*, 135 Mich.App. 361, 354 N.W.2d 341 (1984); *Winiemko v. Valenti*, 203 Mich.App. 411, 416–17, 513 N.W.2d 181 (1994). Michigan courts have recognized, however, that in order to be tortious, defendant's interference with business relations must be wrongful. *See Trepel*, 354 N.W.2d at 346 (requiring that the interference be illegal, unethical or fraudulent); *Winiemko*, 513 N.W.2d 181 (requiring that conduct be "improper"); *see also BPS Labs.*, 552 N.W.2d at 925 (requiring that the act be *per se* wrongful or be done with malice and without justification); *Perry*, 212 Mich. App. at 401, 538 N.W.2d 24 (requiring actual malice where alleged wrongful interference was allegedly defamatory statement about public figure); *Michigan Podiatric Medical Ass'n v. National Foot Care Program, Inc.*, 175 Mich.App. 723, 438 N.W.2d 349 (1989) (requiring the intentional doing of a *per se* wrongful act or the doing of a lawful act with malice for the purpose of invading the business rela-

tionship of another) (quoting *Feldman v. Green*, 138 Mich.App. 360, 378, 360 N.W.2d 881 (1984)).

Defendants contend that United's claim must fail because United has failed to produce evidence that defendants have engaged in wrongful conduct. This court earlier declined to dismiss the claim because the complaint clearly alleges that defendants Keizer and Grant Rent–All had committed wrongful acts by violating Keizer's noncompetition agreement.

As I previously concluded, however, Keizer's competition through Grant Rent–All's Newaygo location does not violate the employment agreement. As a result, the conduct may not be considered wrongful. Accordingly, defendants are entitled to summary judgment on United's claim of tortious interference with business relations.

### E. *Civil Conspiracy*

█ The elements of civil conspiracy are as follows: (1) a concerted action; (2) by a combination of two or more persons; (3) to accomplish an unlawful purpose; (4) or a lawful purpose by unlawful means. *Mays v. Three Rivers Rubber Corp.*, 135 Mich.App. 42, 352 N.W.2d 339 (1984); *Fenestra, Inc. v. Gulf American Land Corp.*, 377 Mich. 565, 141 N.W.2d 36 (1966).

█ First, no evidence exists that Keizer engaged in concerted action with Mulder's or Grant Rent–All. Although Mulder's was aware the Keizer had a noncompetition agreement, United presented no evidence that Mulder's was aware of the content of that agreement. As a re-

sult, no evidence exists that defendants collectively attempted to violate such agreement.

Second, even if such knowledge existed, this court has held that Keizer is entitled to summary judgment on United's individual causes of action, which themselves form the basis for the conspiracy claim. (*See* Amended Complaint, ¶ 39.) As a result, since no evidence exists of an unlawful purpose or means, United has failed to create a genuine issue of fact on a critical element of the conspiracy claim.

Accordingly, defendants are entitled to summary judgment on Count 5 of the Amended Complaint.[4]

### F. *Breach of Fiduciary Duty of Loyalty*

█ United complains that during Keizer's employment with GR Kubota, he breached his fiduciary duty to GR Kubota and United, both under the common law and under his employment agreement. The Michigan courts have held that an agent of a principal owes a fiduciary obligation to the principal not to appropriate the opportunity of the principal for his own benefit. *See Central Cartage Co. v. Fewless*, 232 Mich.App. 517, 591 N.W.2d 422, 426–27 (1998); *Production Finishing Corp. v. Shields*, 158 Mich.App. 479, 405 N.W.2d 171, 174 (1987). An agent who purchases on his own behalf property that the agent was under an obligation to purchase for the principal will be considered as holding the real estate in trust. *See Stephenson v. Golden*, 279 Mich. 710, 276 N.W. 849 (1937). An agent who competes

---

**4.** In addition, Count 4 of the complaint alleges tortious interference with contract only against defendant Mulder's. Although Mulder's has failed to move for summary judgment, judgment in favor of Mulder's on Count 4 nevertheless shall be granted. The count alleges that Mulder's induced or assisted

Keizer in breaching his employment agreement. As with the civil conspiracy claim, because this court has determined that the employment agreement was not breached, no claim lies against Mulder's on an allegation that it induced the breach of the agreement.

with the principal by using confidential information obtained in the course of employment must account to the principal for the profits generated through the use of that confidential information. *Shwayder Chem. Metallurgy Corp. v. Baum*, 45 Mich.App. 220, 206 N.W.2d 484 (1973).

In addition, Keizer's employment agreement specifically barred him from other employment during the period of his agreement with GR Kubota:

is hereby employed as General Sales Manger of the Company and shall devote his full attention, energies and abilities in that capacity of the proper management and conduct of the Company's business, to the exclusion of any other occupation. As General Sales Manager, Employee shall have such duties as are consistent with his duties prior to the date of the Agreement, unless changed by the Officers or Board of Directors in the future, provided, however, that Employee shall be employed at the Company's principal place of business in Kent County, Michigan.

(Def.Ex.F, ¶ 2.)

United contends that Keizer breached his fiduciary duty under both the agreement and Michigan law by financing Grant Rent–All during the time of his employment with GR Kubota. United also contends that he breached the duty by lying to Taalman about his involvement.

Neither allegation amounts to a breach of the employment agreement. Under the recited provision of the employment agreement, Keizer agreed only to employ his full energies to his duties at GR Kubota to the exclusion of any other occupation. United has produced no evidence that Keizer failed to devote his full efforts to GR Kubota or that he engaged in any other occupation, with Grant Rent–All or otherwise, during the course of his employment by GR Kubota. Indeed, United's own managers Taalman and Pearce admitted that they have no evidence that Keizer gave less than his full energies to GR Kubota or in any way employed his energies on behalf of Grant Rent–All.

Similarly, with respect to the common law claim, the undisputed evidence demonstrates that Keizer owned his interest in Grant Rent–All at the time United purchased GR Kubota. The undisputed evidence further demonstrates that GR Kubota's co-owner, GVI, was fully aware of that ownership interest at the time it purchased Keizer's interest in GR Kubota and Keizer signed his employment agreement. Again, since United succeeded to the interest of GR Kubota under the agreement, no basis exists for attributing bad faith to Keizer for any misunderstanding by United of his role. Although some evidence suggests that during the period of Keizer's employment with United, Keizer financed a small expansion of Grant Rent–All's facility, no evidence suggests that Keizer assisted Grant Rent All in conducting the business necessary to meet its loan obligations to Keizer or any financial institution.

Moreover, Michigan courts have addressed few situations in which employees are held liable to their employers for breach of fiduciary duty. The court is aware of no case under Michigan law barring an employee of one company from having a financial interest in another company as long as the employee does not misuse any opportunity owing to the principal or misuse any confidential information belonging to the principal. *See Stephenson*, 279 Mich. 710, 276 N.W. 849 (involving agent who purchases on own behalf property that he was under an obligation to purchase for the principal); *Shwayder*, 45 Mich.App. 220, 206 N.W.2d 484 (involving agent misuse of confidential information acquired through principal). United has not introduced a shred of evidence that Keizer misused any information

or diverted any opportunity belonging to United or GR Kubota. The court is unpersuaded that Michigan would extend the duty of an employee to the circumstances of this case.

Further, where as here, Keizer's involvement with Grant Rent–All was known to all parties contracting for his employment and where Keizer was never asked and never agreed to divest himself of that interest, no fiduciary duty to divest may be said to have arisen. United asserts that a question of fact exists that Keizer misrepresented his interest in Grant Rent–All to J.R. Taalman during his subsequent employment. Even if believed,[5] however, United cites no authority for the proposition that Keizer's statement creates an actionable breach of fiduciary duty. United may not render illegal Keizer's known and contractually approved involvement with Grant Rent–All by declaring after the fact that such involvement violates a fiduciary duty.

Finally, in light of United's failure to identify any opportunity of which it was deprived, no evidence exists that United was in any way damaged by Keizer's ownership interest in Grant Rent–All.

For all these reasons, defendants are entitled to summary judgment on plaintiff's claim of breach of fiduciary duty.

### G. *Counterclaim*

██ United moves for summary judgment on Keizer's counterclaim for breach of employment contract. United contends that, under the agreement, it had the uncontested right to terminate Keizer for any reason, to change his job duties, and to reorganize the business as it saw fit. It therefore contends that it could not have breached the employment agreement by changing duties assigned to Keizer.

Keizer responds that the counterclaim does not allege that United breached the agreement by terminating Keizer. Instead, he contends that the demotion amounted to a constructive discharge and that under the agreement, such discharge was without cause. Accordingly, Keizer contends that he is entitled to the balance of his salary under the remaining term of the employment agreement.

As previously set forth in the statement of facts, Keizer's agreement with GR Kubota provided that he would be employed as General Sales Manager and would have the duties consistent with his duties before entering into the agreement, "unless changed by the Officers or Board of Directors in the future . . . ." (Def.Ex.F, ¶ 2.) The agreement further preserved the company's ability to terminate Keizer for any reason, providing only those circumstances under which the company would be obligated to continue to pay him his salary for the remainder of the contract term.

Keizer first argues that the contract expressly permitted changes to be made to his duties only by the Board of Directors or the official officers of United, a company listed on the New York Stock Exchange. Keizer contends that the officers of United are limited strictly to the Chairman and CEO of United, the Vice Chairman and CEO, the CEO and the Vice President of Strategic Planning. (Def. Ex. 1 to Resp. Br.)

I disagree. The contract, when signed, addressed the officers of GR Kubota, which was not a publicly traded company like United. As a result, the parties at the time of contracting clearly did not contem-

---

5. As the court previously noted, Taalman's testimony on this point, when taken together, is equivocal as to the exact words used by Keizer. In any event, it is undisputed that at the time of signing his contract, Keizer had advised the then-owners of his ownership interest in Grant Rent–All.

plate that the word "officers" would have the meaning Keizer now asserts, inasmuch as the word was directed to GR Kubota, not to United.

Further, no basis exists for concluding that the parties intended to limit the meaning of the word "officers" in the narrow fashion Keizer now asserts or that the use of the word would prohibit any action affecting Keizer's duties by management other than the highest company officers. The dictionary defines "officers" broadly, including any person in an organization hold authority or responsibility. Absent some intent to limit which officers may act, the language of the agreement does not permit the construction asserted by Keizer.

In any event, the question of which officers had the authority to change Keizer's duties is irrelevant to his counterclaim. If Keizer believed that his contract prevented any change in duties except as made by the top officers of United or the board of directors, he had a right to challenge the company's action under the contract at that time. He did not do so. Indeed, in neither his letter of resignation nor in his counterclaim did Keizer assert that the contract was breached because of the lack of authority by Shawn Grasman to change Keizer's duties. Instead, he contended that the change in duties amounted to a constructive discharge equivalent to a discharge without cause under the agreement, entitling him to payment for the remaining term of his contract. As a result, the ultimate and only relevant inquiry is whether a reasonable factfinder could conclude that the change in Keizer's job duties amounted to a constructive discharge.

 Under Michigan law, a constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation. *See Hammond v. United of Oakland, Inc.*, 193 Mich.App. 146, 483 N.W.2d 652 (1992); *Mourad v. Automobile Club Ins. Ass'n*, 186 Mich.App. 715, 465 N.W.2d 395 (1991). A constructive discharge occurs only when an employer's conduct or its agent's conduct is so severe that a reasonable person in the employee's place would feel compelled to resign. *Jacobson v. Parda Fed. Credit Union*, 457 Mich. 318, 325–26, 577 N.W.2d 881, 884 (1998); *Champion v. Nationwide Security, Inc.*, 450 Mich. 702, 710, 545 N.W.2d 596 (1996). Barring unusual circumstances, a transfer at no loss of title, pay, or benefits does not amount to an adverse employment action justifying a claim of constructive discharge. *See Kocsis v. Multi–Care Management*, 97 F.3d 876, 886 (6th Cir. 1996). A finding of constructive discharge depends on the facts of the case. *See Wolff v. Automobile Club of Michigan*, 194 Mich.App. 6, 15, 486 N.W.2d 75 (1992).

In the instant case, Keizer admittedly suffered no change in pay or benefits. In addition, Keizer does not dispute that he had always reported to Shawn Grasman as Branch Manager of the Grand Rapids store. He further does not dispute that he never had any authority over the Hudsonville store. At the time of Keizer's alleged demotion, the company undisputedly combined the General Manager and General Sales Manager positions for the Grand Rapids and Hudsonville stores, rather than employ separate sales managers for each store. As a result, Shawn Grasman became General Manager for both stores and Todd Grasman was named General Sales Manager for both stores. As a result, Keizer stopped being the General Sales Manager for the Grand Rapids store, reporting only to one person, and instead also reported to Todd Grasman as General Sales Manager for both stores.

The sole adverse effect of the resulting reorganization was that Keizer was placed in the role of reporting to a younger and less experienced person. He resented having to clear purchases and sales with an additional manager. The change, however, did not undermine Keizer's ability to continue to sell or to be paid for his efforts. Moreover, Todd Grasman remained in his position for only a matter of a few weeks, at which time Keizer began reporting to Jack Grasman, one of the original Grasman brothers with whom he had been partners at GR Kubota.

Such a limited change in Keizer's role is insufficient evidence from which a reasonable factfinder could conclude he had been constructively discharged. Indeed, Keizer was asked to stay with the company, and Jack Grasman asked him what the company could do to keep him. Keizer was simply unwilling to accept any change in his role. Under Michigan law, the change in Keizer's role is simply not so intolerable as to force a reasonable employee into an involuntary resignation.

Keizer contends, however, that he reasonably considered the change in management to be a constructive discharge because he had accepted the employment agreement with the understanding that he would be employed as General Sales Manager only. That understanding, however, was not reflected in the agreement. The agreement did not prohibit the company from changing his duties. Indeed, it expressly provided that the company had authority to change duties as it saw fit. It did not provide that a change in duties would be considered a constructive discharge, though it did provide that if a reorganization resulted in the business ceasing, the loss of position would be deemed a termination without cause under the agreement, permitting him to be paid for the remaining term of the agreement.

As a result, nothing in the contract creates an understanding that a change in job duties would be considered a termination without cause. Moreover, Keizer's subsequent role at Grant Rent–All, in which he served as a mere salesman who reported to his sons, suggests that Keizer himself did not consider the role change to be so inherently demeaning as to amount to a constructive discharge.

In sum, insufficient evidence exists for any reasonable factfinder to conclude that Keizer was constructively discharged. Accordingly, United is entitled to summary judgment on the counterclaim.

### III.

For the foregoing reasons, the motion of defendants Keizer and Grant Rent–All for summary judgment (docket # 66) is **GRANTED.** Judgment is granted in favor of Keizer and Grant Rent–All on all claims against them. Judgment also is granted in favor of defendant Mulder's on all counts. United's motion for summary judgment on Count I of the complaint (dkt # 71) is **DENIED.** United's motion for summary judgment on Keizer's counterclaim (dkt # 72) is **GRANTED** and judgment is **GRANTED** to United on Keizer's counterclaim. The case is **DISMISSED WITH PREJUDICE.**

### *ORDER AND JUDGMENT*

In accordance with the opinion filed this date,

**IT IS ORDERED** that the motion of defendants Jerry Keizer and Grant Rent–All, Inc., for summary judgment (docket # 66) is **GRANTED.** Judgment is entered in favor of Jerry Keizer and Grant Rent–All, Inc., on all claims against them.

**IT IS FURTHER ORDERED** that judgment is entered in favor of defendant Mulder's Outdoor Power Equipment, Inc.,

d/b/a Mulder's Equipment and Rental on all counts.

**IT IS FURTHER ORDERED** that United Rental's motion for summary judgment on Count I of the complaint (dkt # 71) is **DENIED.**

**IT IS FURTHER ORDERED** that United Rental's motion for summary judgment on Keizer's counterclaim (dkt # 72) is **GRANTED.** Judgment is entered in favor of United Rentals (North America), Inc., on the counterclaim.

**IT IS FURTHER ORDERED** that the case is dismissed in its entirety with prejudice.